(No. 95746.—

(No. 97947.—

*In re* ADOPTION OF L.T.M. (Jo Ellen J. *et al.*, Appellees, v. John M., Appellant.—Ellen Jenkins Curry, Appellee, v. The County of Franklin, Appellant).

*Opinion filed January 21, 2005.*

Ellen Jenkins Curry, of Benton, for appellant, and John M., of Ina, appellant *pro se.*

No appearance for appellee.

William K. Richardson, State's Attorney, of Benton (Norbert J. Goetten, Stephen E. Norris and Patrick D. Daly, of the Office of the State's Attorneys Appellate Prosecutor, of Mt. Vernon, of counsel), for appellant.

Ellen Jenkins Curry, of Benton, appellee *pro se.*

JUSTICE GARMAN delivered the opinion of the court:

In the underlying case, No. 95746, John M. appeals the circuit court's finding that he is an unfit parent, as defined by section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2000)), as to his son, L.T.M. Based on that finding, on September 27, 2002, the circuit court entered a judgment of adoption that terminated John's parental rights. John appealed first to the appellate court, where he moved, *inter alia,* for appointment of counsel and for a certified copy of the entire record. The appellate court denied both motions. Subsequently, on January 29, 2003, the appellate court dismissed John's appeal for want of prosecution, based on his failure to file the record on appeal. John then filed a petition for leave to appeal, which we allowed. On August 26, 2003, we allowed John's motion for stay of adoption pending appeal.

The consolidated case, No. 97947, arises from this court's order, entered July 8, 2003, which directed the circuit court of Franklin County to appoint counsel for John. The circuit court appointed attorney Ellen Jenkins

Curry. Curry prepared and filed John's brief in No. 95746, and then petitioned the circuit court for approval of attorney fees. Franklin County, by State's Attorney William K. Richardson, entered a limited appearance and objected to the fee petition. After a hearing, the circuit entered an order on November 7, 2003, requiring Franklin County to pay Curry fees and costs to date in the amount of $6,153.94. The County filed a notice of appeal and, subsequently, filed a motion for leave to appeal directly to this court, which we allowed and consolidated with No. 95746.

## BACKGROUND

The following description of the facts in the underlying adoption case is based primarily on the testimony at the hearing preceding the judgment of adoption from which John appeals. Some facts are drawn from transcripts and orders in other proceedings involving John, which have been made part of the record in this case.

L.T.M. was born on December 28, 1989. He was the second child born to John and Jo Ellen E., now known as Jo Ellen J. The first child, D.M., a daughter, is not involved in this appeal. John and Jo Ellen were never married. They did not live together at any time after L.T.M. was born. L.T.M. has always lived with Jo Ellen and has never lived with John. The record further indicates that at some time John was married to one Kelly M., that the marriage has been dissolved, and that Kelly has adopted D.M. The record does not provide dates for these events.

Jo Ellen went to work when L.T.M. was about 3½ months old. On weekdays, Jo Ellen would leave L.T.M. at John's house while she worked or attended school. Jo Ellen testified that a "child care provider," not John, cared for L.T.M. while he stayed at John's house. The parties agree that John saw L.T.M. for the last time when the boy was approximately 19 months old. The parties

also agree that John has never paid child support for L.T.M.

On February 27, 1995, the circuit court of Williamson County entered an order granting sole custody of L.T.M. to Jo Ellen, and awarding restricted visitation to John under the supervision of the Department of Children and Family Services (DCFS). The custody proceeding had been initiated by John. No visitation ever occurred.

On April 3, 1996, John was convicted in the circuit court of Jackson County of armed violence, unlawful use of a weapon, and aggravated unlawful restraint. He was sentenced on those convictions to concurrent terms of 25, 2, and 10 years, respectively. John had entered the grade school where D.M. was in a classroom, menaced her teacher with a handgun, removed D.M. from the school, and fled with her to Washington state. John testified he was taken into custody in Washington on September 9, 1995. He has been incarcerated ever since. He testified that he is due to be released from the penitentiary in 2010.

John testified at length about his efforts, both before and after his incarceration, to visit or support L.T.M. (We discuss that testimony below, when we analyze the merits of his appeal.) John also testified at length about his reasons for abducting D.M. Briefly, he believed that Kelly was abusing D.M. physically and sexually, and he was frustrated by the failure of his attempts to obtain custody of D.M. through the courts. The record amply demonstrates that John has been an energetic litigant, both before and after his incarceration, with counsel and without, in this proceeding and in others. John argued to the court at the fitness hearing that, because his attempts to care for and protect his children by other means have been thwarted, litigation has been his only avenue.

By 2000, Jo Ellen had married Randall J. On June

22, 2000, the couple filed a petition for Randall to adopt L.T.M. Initially, John was represented by attorney Timothy Capps. However, on May 14, 2002, Capps moved for leave to withdraw, stating that he and John disagreed on matters of case strategy and that John wished to represent himself. On June 14, 2002, John appeared in open court and confirmed that he and Capps disagreed and that he wished to represent himself. The court then granted Capps' motion to withdraw. At no time did John ask the court to appoint counsel for him.

Jo Ellen and Randall's petition alleged John was an unfit parent on four grounds. However, at the hearing on their petition on September 16, 2002, they elected to proceed on two grounds only: depravity (750 ILCS 50/1(D)(i) (West 2000)) and failure to maintain a reasonable degree of interest, concern or responsibility (750 ILCS 50/1D(b) (West 2000)). After the fitness portion of the hearing, the court found John was not depraved, but found him unfit for failure to maintain a reasonable degree of interest, concern or responsibility. The court then proceeded to the best-interests hearing and found that it was in L.T.M.'s best interests that the petition for adoption be granted and that John's parental rights be terminated. These appeals ensued, as previously described. John stated in open court that, although he disputed the finding of unfitness, he "would waive any argument, the best interest [*sic*]. If I am unfit as a parent, [Randall] seems okay." Thus our review of the judgment of adoption is limited to the finding of unfitness.

## ANALYSIS

### I. No. 95746—The Adoption Action

*A. Right to a Free Record in an Appeal as of Right*

The order immediately before us is that of the appellate court, entered January 29, 2003, dismissing John's appeal for want of prosecution based on his failure to file

the record on appeal. That order implicates the appellate court's prior order denying John's motion for a copy of the record. We review *de novo* the appellate court's conclusion that John had no right to a record.

The federal constitution requires that, when a state affords an appeal as of right from an order terminating parental rights in a private adoption, it may not deny indigent parents a record of sufficient completeness to permit proper appellate review. *M.L.B. v. S.L.J.*, 519 U.S. 102, 128, 136 L. Ed. 2d 473, 495, 117 S. Ct. 555, 570 (1996). Therefore, upon motion and showing of indigency, the State was obliged to provide a sufficient record to John. It is clear from the undisputed claims in his financial affidavit that John was indigent when he petitioned the appellate court for a free copy of the record. Accordingly, the appellate court erred in denying John's request for a free copy of the record. The appellate court erred again when it dismissed his appeal for failure to file the record on appeal, because John's failure to file the record was obviously caused by the fact he had none to file. Accordingly, we reverse the appellate court's dismissal of John's appeal.

### B. The Circuit Court's Finding of Unfitness

We choose not to remand John's appeal to the appellate court. In the interest of judicial economy and, more importantly, because of L.T.M.'s interest in the speedy resolution of his status, we choose instead to review the circuit court's finding that John is an unfit parent.

Generally, the adoption of a minor child requires the consent of both parents. See 750 ILCS 50/8(b) (West 2000). However, if the trial court finds a parent to be an unfit person, as defined in the Adoption Act, by clear and convincing evidence, that parent's consent is not required. 750 ILCS 50/8(a)(1) (West 2000) (referring to grounds for unfitness enumerated at 750 ILCS 50/1(D) (West 2000)). The burden of presenting clear and convinc-

ing evidence of unfitness is on those petitioning for adoption. *In re Adoption of Syck*, 138 Ill. 2d 255, 274 (1990). We will reverse a trial court's finding of unfitness only if it is against the manifest weight of the evidence. *Syck*, 138 Ill. 2d at 274.

In this case, the trial court found John unfit on the ground that he failed to maintain a reasonable degree of interest, concern or responsibility as to L.T.M.'s welfare. See 750 ILCS 50/1(D)(b) (West 2000). When a parent is alleged unfit on that ground, the trial court "is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts." *Syck*, 138 Ill. 2d at 279. Furthermore, "the issue is whether a parent maintained concern, interest and responsibility as to his or her child's welfare that, under the circumstances, was of a *reasonable* degree." (Emphasis in original.) *Syck*, 138 Ill. 2d at 280. As explained below, however, in this case the utter failure of John's purported efforts would amply demonstrate that John's efforts were not reasonable under the circumstances.

The evidence relevant to the finding of unfitness included the following. (1) John has not seen or supported L.T.M. at least since he was 19 months old, that is, since approximately July of 1991. (2) John brought a Christmas present for L.T.M. to Jo Ellen's workplace in 1991, and he brought approximately $40 for L.T.M. to her workplace in 1992, but Jo Ellen refused to accept these offers. (3) Jo Ellen always refused to give John her address. (4) John obtained an order from the Williamson County circuit court, entered February 27, 1995, requiring supervised visitation with L.T.M., with arrangements to be made by DCFS. Nelson Adams, site administrator of the DCFS offices in Marion and Murphysboro, testified he had done a search of the DCFS records for Williamson County. There was no record relating to L.T.M. There was a record relating to D.M., which had been

transferred to Springfield in December of 1995. Adams was not aware of any pleading filed by John seeking to have DCFS cited for contempt for failure to obey the visitation order. (5) John has been incarcerated since September 9, 1995.

John testified at length that he made strenuous and persistent efforts to locate, visit and support L.T.M. ever since the time he last saw L.T.M. According to John, he was continuously thwarted by Jo Ellen and the courts and, later, by DCFS. He further testified at length that he has made every effort to maintain his interest in L.T.M. within the limits of his incarceration. However, the circuit court found John's testimony "that he has been thwarted ***, because of the actions of various individuals, whether it is the courts of this state, conspiring with the mother, whether it is the Department of Children and Family Services *** to not be credible." We take this to mean the court did not believe any of John's attempts to explain his failure to visit or financially support L.T.M. between the summer of 1991 and the date John was incarcerated in September of 1995.

Disregarding John's testimony, as was its right, the court was left with very little explanation of John's utter failure to visit or support L.T.M. during the four years prior to John's incarceration. Jo Ellen's testimony makes clear she did not want John to visit or support L.T.M. However, the evidence of her efforts to stop him during that four-year period is limited to refusal of two gifts and refusal to provide her address. Thus, the court was left with the fact of no visitation or support and the fact that John was at least able to contact Jo Ellen at work in 1991 and 1992. There is no evidence in the record, other than John's discredited testimony, of the sorts of efforts that a parent might reasonably use to locate or support a child. Yet, according to John, he had run his own business—a bookstore—and later became a registered nurse

who earned "good money." Where there is no credible and adequate explanation of the undisputed failure of a parent to visit or support his child for over four years, we cannot say the court's finding that there is clear and convincing evidence of a failure to maintain reasonable interest, concern or responsibility is manifestly wrong. The circuit court could infer that a person of John's professed abilities and means who applied reasonable efforts would achieve far better results than actually occurred.

None of the foregoing should be construed to mean that the burden was on John to prove himself fit. As explained above, Jo Ellen and Randall had to prove John unfit by clear and convincing evidence. However, the sheer fact of no contact or support for the four years prior to his incarceration could be taken by the circuit court as clear and convincing evidence meeting both the burden of production and, if not adequately explained, the burden of persuasion as well.

John's failure to visit or support L.T.M. after his incarceration cannot count against him in the same way, since that failure is not unexplained. On the other hand, we do not believe the circuit court was required to weigh John's actions while incarcerated in his favor. John is responsible for his incarceration.

In *Syck*, we reversed a trial court's finding that a mother was unfit for failure to maintain a reasonable degree of interest, concern or responsibility for her son, where the father refused her efforts to contact the child. *Syck*, 138 Ill. 2d at 281-82. However, in *Syck* the trial court believed the mother's claim that her repeated efforts to contact her son had been thwarted by the father and his parents. *Syck*, 138 Ill. 2d at 270. That alone distinguishes *Syck* from this case. Moreover, the mother in *Syck* was uneducated and impoverished.

In sum, we cannot say the circuit court's finding that

John is an unfit parent as to L.T.M. is against the manifest weight of the evidence. We therefore affirm the finding of unfitness and the judgment of adoption.

## II. No. 97947—The Appointment of Counsel on Appeal

### A. Separation of Powers/Appointment of Counsel in Discretionary Appeal

Many of the principles necessary to our resolution of this appeal have been set forth in *In re Adoption of K.L.P.*, 198 Ill. 2d 448 (2002). *K.L.P.* also involved a termination of parental rights under the Adoption Act. The appellate court appointed counsel for the respondent mother, and subsequently ordered Kendall County to pay counsel's fees. We upheld that order. *K.L.P.*, 198 Ill. 2d at 471-72. However, we decided the crucial question whether the adoption in *K.L.P.* implicated "state action" on the unique facts of that case, and expressly left open the question whether appellate counsel for indigent parents is required in every case brought under the Adoption Act. *K.L.P.*, 198 Ill. 2d at 465.

The Illinois Constitution mandates that "[n]o branch [of government] shall exercise powers properly belonging to another." Ill. Const. 1970, art. II, § 1. In this case, as in *K.L.P.*, a court order "requires a county treasurer to disburse county funds where the expenditure was neither anticipated or budgeted by the executive branch nor authorized by the legislative branch of county government." *K.L.P.*, 198 Ill. 2d at 457. Thus, the question arises whether the court's order violates the constitutional requirement of separation of powers. However, "the judicial branch may, indeed must, intervene in matters generally reserved to the other branches of state government when an action of the executive or legislative branches offends the Illinois or United States Constitutions." *K.L.P.*, 198 Ill. 2d at 458. If the appointment of counsel in this case was constitutionally man-

dated, then the circuit court's order directing the County to pay attorney fees is valid and the County must obey.

We note that, regardless of whether counsel was constitutionally mandated, our order directing the circuit court to appoint counsel was within our supervisory authority over the courts of this state. Our supervisory authority over the lower courts is unlimited in extent. *McDunn v. Williams*, 156 Ill. 2d 288, 302 (1993). Thus, the circuit court was obliged to appoint counsel for John. The circuit court's further order directing the County to pay attorney fees was certainly justifiable. Duly-appointed counsel had documented the work she performed, to which the court applied an hourly rate it found reasonable. Nevertheless, the County's obligation to obey that order depends on whether the appointment of counsel was constitutionally mandated, which our supervisory order requiring appointment of counsel did *not* decide.

As a threshold matter, we consider that counsel in this case was appointed to represent John in this court, and John's appeal to this court was a matter of discretion, not of right. As the County points out, the federal constitution provides no right to appointed counsel to obtain discretionary appellate review. *Ross v. Moffitt*, 417 U.S. 600, 619, 41 L. Ed. 2d 341, 355-56, 94 S. Ct. 2437, 2448 (1974). Moreover, this court has denied payment of fees to counsel appointed by the appellate court to file a petition for leave to appeal on behalf of an indigent criminal defendant. *People v. Davis*, 79 Ill. 2d 472, 473 (1980).

In this case, John requested appointed counsel for his appeal as of right. That request was denied. He requested a copy of the record be supplied to him free of charge. That was also denied. After his appeal was dismissed for failure to file the record on appeal, John sought, *pro se*, leave to appeal to this court. We allowed

his petition to decide whether he had a constitutional right to a free record on appeal. Only then did we order the circuit court to appoint counsel for John. This case differs from *Moffitt* and *Davis* in that John requested counsel only after obtaining discretionary review. Moreover, unlike the criminal defendants in *Moffitt* and *Davis*, John was denied appointed counsel during his appeal as of right. If John had had counsel in the appellate court, his ability to press his clear constitutional right to a free copy of the record would probably have been much enhanced. In view of these unusual circumstances, we hold that *if* John had a constitutional right to appointed counsel in the appellate court then *after* he obtained discretionary review in this court due process required that the right denied in the appellate court be honored in this court. If a parent has the right to appointed counsel at all, he has it in his appeal as of right. *K.L.P.*, 198 Ill. 2d at 471. Thus, we must decide whether John had any constitutional right to appointed counsel.

### B. Equal Protection

John claims he was entitled to appointed counsel under both the due process and equal protection clauses of the fourteenth amendment to the United States Constitution. For the following reasons, we find John's equal protection claim to be dispositive.

The fourteenth amendment is directed at the states and thus "can be violated only by conduct that may be fairly characterized as 'state action.' " *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 923-24, 73 L. Ed. 2d 482, 486-87, 102 S. Ct. 2744, 2746-47 (1982). The Supreme Court has found state action where "the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State." *Lugar*, 457 U.S. at 937, 73 L. Ed. 2d at 495, 102 S. Ct. at 2753. State action is a precondition of invoking the equal protection clause as well as the due process clause. *Edmonson v. Leesville Concrete Co.*, 500

U.S. 614, 619, 114 L. Ed. 2d 660, 672, 111 S. Ct. 2077, 2082 (1991).

"The guarantee of equal protection requires that the government treat similarly situated individuals in a similar manner." *In re R.C.*, 195 Ill. 2d 291, 309 (2001). While the Juvenile Court Act provides appointed counsel to all indigent parents threatened with the loss of parental rights (705 ILCS 405/1—5(1) (West 2000)), the Adoption Act provides that benefit only to parents who are alleged to be unfit because of mental disability under section 1(D)(p) of the Act (750 ILCS 50/13(B)(c) (West 2000)). John claims he is situated similarly to a parent who would be entitled to appointed counsel under the Juvenile Court Act. The gravamen of John's claim is thus that the statutory scheme provides a benefit to others, but not to him, on the basis of a constitutionally illegitimate classification.

John needed counsel because Jo Ellen and Randall sought to terminate his parental rights. However, the reason he needed counsel is not part of his claim. John's equal protection claim challenges the way the Juvenile Court Act and the Adoption Act distribute the benefit of appointed counsel. John alleges the statutes denied him equal protection of the laws, not that Jo Ellen and Randall did so. The question whether Jo Ellen and Randall are state actors therefore does not arise. Cases such as *Lugar* and *Leesville Concrete*, which concern whether the actions of private litigants may be attributed to the state, are inapposite. For example, in *Leesville Concrete*, 500 U.S. at 619-28, 114 L. Ed. 2d at 672-79, 111 S. Ct. at 2082-87, the equal protection claim was that a private litigant used its peremptory challenges to exclude jurors on the basis of race. By contrast, John does not claim Jo Ellen and Randall used the Adoption Act in a discriminatory way.

Enactment of a statute is obviously state action,

regardless of whether the state is responsible for a particular private litigant who relies on a statute. See *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 486-87, 99 L. Ed. 2d 565, 576, 108 S. Ct. 1340, 1345-46 (1988). Thus, there is sufficient state action for purposes of John's equal protection claim.

Statutory classifications that affect a fundamental right violate the equal protection clause unless they are narrowly tailored to serve a compelling state interest. *R.C.*, 195 Ill. 2d at 309. In this case, the classification is the distinction between parents who must answer a petition to terminate their parental rights under the Juvenile Court Act and those, like John, who must answer under the Adoption Act. The right to parent one's child is a fundamental right. *K.L.P.*, 198 Ill. 2d at 467. Clearly, John's parental rights were burdened by this classification because the circuit court terminated his parental rights under the Adoption Act, and he was denied appointed counsel in his appeal as of right from that order, when he certainly would have had it under the Juvenile Court Act. Nevertheless, the equal protection guarantee does not apply unless John is situated similarly to a parent facing termination of his rights in proceedings under the Juvenile Court Act. See *R.C.*, 195 Ill. 2d at 311.

Generally, a person who stands to lose a right under one statute is not similarly situated to persons who face the same loss under an entirely different statute with a different legislative purpose. See, *e.g.*, *In re Detention of Samuelson*, 189 Ill. 2d 548, 563-64 (2000) (discussing equal protection challenges to the Sexually Violent Persons Act and the Sexually Dangerous Persons Act based on a comparison with persons facing commitment under the Mental Health Code). In *R.C.*, we rejected the claim that a mother who had surrendered custody of her child and now faced termination of her rights under the Adoption Act was similarly situated to parents who had

lost custody under section 2—10 the Juvenile Court Act and were entitled to services from DCFS. *R.C.*, 195 Ill. 2d at 311. Clearly, the purposes of the Adoption Act are not identical to the purposes of the Juvenile Court Act. Nevertheless, a parent who stands to lose his rights under the Adoption Act if he is found unfit is in a very similar situation to a parent who stands to lose the very same constitutional right, based on the very same finding, in proceedings under the Juvenile Court Act. Indeed, the Juvenile Court Act's termination provision incorporates the Adoption Act's definition of unfitness. 705 ILCS 405/2—29(2) (West 2000). In this case, therefore, we find that John is similarly situated to parents facing termination of parental rights under section 2—29(2) of the Juvenile Court Act.

Having found that John is similarly situated to parents who would be entitled to counsel under the Juvenile Court Act, we consider whether the Adoption Act's failure to provide counsel serves a compelling government interest and is narrowly tailored to do so. We find there is no compelling state interest served by that failure. The only state interest served by denying appointed counsel under the Adoption Act is the interest in limiting the payment of attorney fees. There is certainly a legitimate interest in controlling expenditures on appointed counsel. *K.L.P.*, 198 Ill. 2d at 469, quoting *In re Adoption of K.L.P.*, 316 Ill. App. 3d 110, 122 (2000), quoting *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 68 L. Ed. 2d 640, 650, 101 S. Ct. 2153, 2160 (1981). However, that legitimate interest is not compelling. *K.L.P.*, 198 Ill. 2d at 469, quoting *K.L.P.*, 316 Ill. App. 3d at 122, quoting *Lassiter*, 452 U.S. at 27, 68 L. Ed. 2d at 650, 101 S. Ct. at 2160. The State may maintain reasonable control of expenditures without flatly denying counsel to an entire class of persons whose parental rights are at stake. For example, the State certainly may

insist on paying only those fees that are reasonable and necessary. Because it serves no compelling state interest, the Adoption Act's failure to provide John appointed counsel, which he would have had under the Juvenile Court Act, violates respondent's constitutional right to the equal protection of the laws.

We must now decide whether the remedy for this constitutional violation is to require the state to extend the benefit to those who have been excluded or to withdraw the benefit from those who have been favored. See *R.C.*, 195 Ill. 2d at 309-10, citing *Heckler v. Mathews*, 465 U.S. 728, 79 L. Ed. 2d 646, 104 S. Ct. 1387 (1984). We note the highest courts of other states that have faced the same remedial question have opted to extend the benefit of appointed counsel for indigent parents facing termination of parental rights in private adoptions. *In re S.A.J.B.*, 679 N.W.2d 645, 651 (Iowa 2004). *In re K.A.S.*, 499 N.W.2d 558, 566-67 (N.D. 1993). *In re Fanning*, 310 Or. 514, 523-24, 800 P.2d 773, 779 (1990). Moreover, we note our legislature could have, consistent with the Constitution, refused to provide a blanket right to counsel under the Juvenile Court Act and could have instead left the provision of counsel to the trial court on a case-by-case basis. See *Lassiter*, 452 U.S. at 31-32, 68 L. Ed. 2d at 652, 101 S. Ct. at 2162. However, the legislature decided the wiser course is to provide counsel in all cases. We do not favor a remedy that nullifies the considered judgment of the legislature. Therefore, we will not eliminate the statutory right to counsel under the Juvenile Court Act. Accordingly, we hold the state is required by the equal protection clause of the fourteenth amendment to provide appointed counsel to indigent parents who face the loss of parental rights in proceedings under the Adoption Act.

## CONCLUSION

The Constitution requires that John, who is indigent,

is entitled to a copy of the record sufficient for a proper appeal. Therefore the appellate court erred when it denied his motion for a copy of the record and then dismissed his appeal for failure to file the record on appeal. John's appeal is reinstated. However, the circuit court's finding that John is an unfit parent as to L.T.M. by clear and convincing evidence is not against the manifest weight of the evidence. The judgment of adoption in No. 95746 is affirmed.

The enactment of a statutory scheme that provides appointed counsel for indigent parents facing termination of parental rights under the Juvenile Court Act, but not under the Adoption Act, violates the equal protection clause of the fourteenth amendment to the United States Constitution. The remedy is to provide appointed counsel under the Adoption Act as well. Appointment of counsel for John was constitutionally mandated. Therefore, the order of the circuit court requiring Franklin County to pay attorney Curry's reasonable fees and costs in the amount of $6,153.94, which was entered pursuant to this court's order, does not violate the separation of powers principles of the Illinois Constitution. That order is affirmed.

> *No. 95746—Appellate court order reversed;*
> *circuit court order affirmed.*
> *No. 97947—Circuit court order affirmed.*

JUSTICE KARMEIER took no part in the consideration or decision of this case.