NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190627-U

NO. 4-19-0627

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 8, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* the Adoption of P.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (Ryan B. and Kristy B., | ) | Macon County |
| Petitioners-Appellees, | ) | No. 19AD4 |
| v. | ) | |
| Lashaun P., | ) | Honorable |
| Respondent-Appellant). | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Presiding Justice Steigmann and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's findings respondent was unfit under section 1(D)(b) of
the Adoption Act and it was in the minor child's best interests to terminate
respondent's parental rights were not against the manifest weight of the evidence.

¶ 2    In February 2019, petitioners, Ryan B. and Kristy B., filed a petition for the
adoption of P.B. (born in June 2014), the minor son of Kristy B. and respondent, Lashaun P.  The
petition asserted respondent was an unfit parent on numerous grounds.  After a July 2019
hearing, the Macon County circuit court found respondent unfit as alleged in the adoption
petition.  At an August 2019 hearing, the court found it was in the P.B.'s best interests to
terminate respondent's parental rights.

¶ 3    Respondent appeals, asserting the circuit court erred by (1) finding him unfit and
(2) concluding it was in P.B.'s best interests to terminate his parental rights.  We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        The February 2019 adoption petition asserted respondent was unfit because he (1) abandoned the minor child (750 ILCS 50/1(D)(a) (West 2018)); (2) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor child's welfare (750 ILCS 50/1(D)(b) (West 2018)); (3) deserted the minor child for more than three months next preceding the commencement of the adoption proceeding (750 ILCS 50/1(D)(c) (West 2018)); (4) was depraved because he had been convicted of three felonies (750 ILCS 50/1(D)(i) (West 2018)); (5) evidenced an intent to forgo his parental rights by failing to visit, communicate, or maintain contact with the minor child (750 ILCS 50/1(D)(n)(1)(i), (ii), (iii) (West 2018)); (6) evidenced an intent to forgo his parental rights as shown by his failure to commence legal proceedings to establish his paternity under the Illinois Parentage Act of 1984 (750 ILCS 45/1 *et seq.* (West 2014)) within 30 days of being informed he is the father or the likely father of the minor child and to pay a reasonable amount of the expenses related to the minor child's birth or to provide a reasonable amount of support of the minor child (750 ILCS 50/1(D)(n)(2)(i), (ii) (West 2018)); and (7) repeatedly and continuously failed, although physically and financially able, to provide the minor child with adequate food, clothing, or shelter (750 ILCS 50/1(D)(o) (West 2018)).

¶ 6        On July 9, 2019, the circuit court commenced the fitness hearing. Petitioners presented the testimony of (1) Kristy and (2) Deborah H., Kristy's mother. Petitioners also presented certified copies of respondent's three felony convictions, the most recent of which occurred in 2014. Respondent testified on his own behalf and presented the testimony of his daughter, Brittney P., and his sister, Dana C. Respondent also presented photographs of him and P.B., as well as photographs of text messages between respondent and Kristy. The evidence relevant to the issues on appeal follows.

¶ 7            Kristy testified she and Ryan had been married since September 2016. They had a daughter together. Kristy, Ryan, P.B., and petitioners' daughter live together. Ryan also had two teenage children from a prior relationship who lived in Kansas.

¶ 8            Kristy began dating respondent in July 2013 and got pregnant with P.B. in September 2013. Respondent moved in with Kristy in October or November 2013. Kristy had a job and paid all the bills. Respondent did not work and did not pay any bills. Respondent was not present when P.B. was born. He did come to the hospital the day after P.B. was born and refused to sign P.B.'s birth certificate. Respondent had never signed the birth certificate.

¶ 9            At home after P.B.'s birth, Kristy continued to pay all the bills and provide for P.B.'s needs. Respondent never contributed to expenses and did not help care for P.B. After 12 weeks of maternity leave, Kristy returned to work. When Kristy worked, her mother cared for P.B. Respondent was unemployed at the time but did not help care for P.B. Respondent moved out of Kristy's home in October 2014, and Kristy obtained a new residence with P.B. around the same time. At the new residence, respondent would visit two or three times a month for 20 to 30 minutes. Respondent would only interact "[a] little" with P.B. during visits. Additionally, respondent never gave Kristy any money for expenses. P.B. was hospitalized in December 2014 and August 2015, and respondent did not come to visit.

¶ 10           Respondent was in prison from December 2015 to November 2018. During that time, respondent never sent P.B. a card or Kristy money for P.B.'s care. Upon his release from prison, respondent moved into his girlfriend's home, which was a few houses down from petitioners' residence. Respondent was required to wear an ankle bracelet and had restricted movement. Respondent sent his daughter down to Kristy's home to arrange for visits with P.B. Kristy took P.B. to respondent's girlfriend's home on three occasions. Each visit lasted for about

20 minutes. During the visits, respondent would ask P.B. who respondent was and what was his name. Respondent was not home for a fourth visit. Kristy never said respondent could not see P.B. but did provide times that were unavailable for visits due to her and P.B.'s schedules. In January 2019, respondent filed a petition seeking defined visitation rights. Since filing his petition, respondent had not seen P.B. and did not send him a birthday card.

¶ 11 Deborah testified she watched P.B. when Kristy went back to work after her maternity leave. The first week she watched P.B. at Kristy's home. Respondent never offered to care for P.B. while Deborah was watching P.B. After the first week, Deborah would pick up P.B. and watch him at her home in Latham, Illinois. Deborah watched P.B. until Kristy stopped working when P.B. was two years old. Respondent never offered to watch P.B. She also never observed respondent offer to pay any expenses for P.B. Further, Deborah was never aware of respondent having a job.

¶ 12 Respondent testified he did provide financial support for P.B. He would provide whatever things Kristy asked him to provide. Respondent worked for D & O Contractors for two years doing odd jobs. Respondent also testified he did things fathers do for P.B. after his birth. According to respondent, he had played an active role in P.B.'s life since his birth. He stated he provided P.B. birthday presents and presented a photograph of him at P.B.'s first birthday party. He also presented a photograph of him and P.B. at a doctor's appointment.

¶ 13 Additionally, respondent testified he was released from house arrest on January 2, 2019, and began looking for a job. At the time of his hearing, he had been working for People Ready for a month. He got paid $11 per hour and received a paycheck every week. Despite being employed for a month, respondent still had not provided Kristy any money for P.B.

¶ 14 Brittney testified she was respondent's 21-year-old daughter. She was about 16

- 4 -

years old when P.B. was born. She said respondent interacted very well with P.B. before he went to prison. She said respondent would play with P.B. and buy him things. After respondent was released from prison, Brittney described respondent and P.B.'s interactions as "good." She said respondent did not get to see P.B. much. According to Brittney, respondent attempted to see P.B. every day. Respondent did see P.B. on Christmas and gave P.B. Christmas presents. Brittany also testified respondent had changed since getting out of prison and had become a great father. Respondent was now working.

¶ 15    Dana testified respondent had been in P.B.'s life a lot since his birth. She also testified respondent would buy P.B. gym shoes. Since his release from prison, respondent had tried to spend time with P.B. He would send Brittney down to Kristy's home to bring P.B. over for visits. Dana had seen P.B. at respondent's home two or three times since his release from prison. Dana also testified respondent was a changed person since his release from prison in November 2018.

¶ 16    After hearing the parties' arguments, the circuit court found respondent unfit on all seven grounds alleged in the petition. The court noted it found respondent's testimony not to be credible.

¶ 17    On August 14, 2019, the circuit court held the best-interests hearing. Petitioners both testified, and respondent testified on his own behalf.

¶ 18    Ryan testified he had an immune disease and had been on dialysis since October 2010. His dialysis treatments were done at home four times a week, and the treatments were 5½ hours long. Except for his renal disease, he was in good health and had been told he had a normal life expectancy. Ryan started dating Kristy when P.B. was nine months old. He moved in with Kristy in June 2015 when P.B. was a year old. At that time, if Ryan was not receiving a

dialysis treatment, he was caring for P.B. Ryan testified he changed P.B.'s diapers, fed him, and bathed him. Ryan considered P.B. his son, and they had a father-son relationship. P.B. was five at the time of the hearing. Ryan and P.B. played games together, watched television, played hide and seek, and went to the park. Ryan and Kristy had a daughter together and had another child on the way.

¶ 19    Ryan was on disability due to his renal disease and received social security disability payments. He was able to support his family on the disability payments.

¶ 20    Kristy testified she and Ryan had been married since September 2016. She assisted Ryan with his dialysis treatments. His treatments did not inhibit his ability to be a father to the children. She considered Ryan to be P.B.'s dad, and P.B. called Ryan "daddy." P.B. looked up to Ryan. When Ryan gets up in the mornings, P.B. is there talking to him. Ryan and P.B. take care of the dog together and talk about sports teams. Ryan never left the hospital when P.B. was hospitalized in August 2015. Ryan also attended P.B.'s school orientations. According to Kristy, Ryan and P.B. have a loving relationship. They do everything together, and sometimes P.B. preferred to spend more time with Ryan than Kristy. Additionally, Kristy also testified she would discuss P.B.'s African American heritage with him when he was older. If the adoption was approved, P.B. would not have access to respondent.

¶ 21    Respondent was concerned about P.B. not knowing him. He also had concerns about P.B. knowing his African American heritage. Respondent also testified he had filed a petition seeking visitation time with P.B., so they could spend one-on-one time. Additionally, respondent did not object to financially supporting P.B. Respondent had a new job making more money than his last job. He had not been in any legal trouble since the last hearing and was still living at his girlfriend's house, which is two houses from petitioners' home.

¶ 22    At the conclusion of the hearing, the circuit court found it was in P.B.'s best interests to terminate respondent's parental rights. On August 23, 2019, the court entered a written order terminating respondent's parental rights to P.B.

¶ 23    On September 10, 2019, respondent filed a notice of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). Thus, this court has jurisdiction of the appeal pursuant to Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017).

¶ 24                                    II. ANALYSIS

¶ 25    With the adoption of a minor child, the consent of both parents is generally required. See 750 ILCS 50/8(b)(1) (West 2018). However, if the circuit court finds by clear and convincing evidence a parent is an "unfit person" as defined in the Adoption Act, then that parent's consent is not required. *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 67, 824 N.E.2d 221, 226 (2005). "The burden of presenting clear and convincing evidence of unfitness is on those petitioning for adoption." *L.T.M.*, 214 Ill. 2d at 67-68, 824 N.E.2d at 226. If the parent is found by clear and convincing evidence to be unfit, then the circuit court next considers the minor "child's best interests and whether those interests would be served by the child's adoption by the petitioners, requiring termination of the natural parent's parental rights." *In re Adoption of Syck*, 138 Ill. 2d 255, 277, 562 N.E.2d 174, 184 (1990). The petitioner must prove by a preponderance of the evidence termination of the respondent parent's parental rights is in the best interests of the minor child. See *Syck*, 138 Ill. 2d at 276-77, 562 N.E.2d at 183-84 (requiring clear and convincing evidence only as to unfitness).

¶ 26    Since the circuit court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E.2d 422, 427

(2001). Further, in matters involving minors, the circuit court receives broad discretion and great deference. *E.S.*, 324 Ill. App. 3d at 667, 756 N.E.2d at 427. Thus, a reviewing court will not disturb a circuit court's unfitness finding and best-interests determination unless they are contrary to the manifest weight of the evidence. See *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516-17 (2005) (fitness finding); *In re J.L.*, 236 Ill. 2d 329, 344, 924 N.E.2d 961, 970 (2010) (best-interests determination). A circuit court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Gwynne P.*, 215 Ill. 2d at 354, 830 N.E.2d at 517.

¶ 27                              A. Respondent's Fitness

¶ 28          Respondent contends the circuit court erred by finding him unfit. In this case, the circuit court found respondent unfit on all seven grounds alleged in the adoption petition. One of those grounds alleged respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor child's welfare. See 750 ILCS 50/1(D)(b) (West 2018).

¶ 29          With that unfitness ground, any of its three elements "may be considered on its own as a basis in determining whether the parent is unfit." *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24, 77 N.E.3d 1173. A finding of unfitness under that section is "based on a subjective analysis." *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. Moreover, this unfitness ground "does not focus on the parent's success but, rather, the reasonableness of her efforts and takes into account the parent's difficulties and circumstances." *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. However, a parent's demonstration of some interest, affection, or responsibility toward his or her child does not make him or her fit under this ground; rather, the parent's interest, concern, and/or responsibility must be reasonable. *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. Last, we note " '[n]oncompliance with an imposed service plan, a continued

addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under [ground] (b).' " *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24 (quoting *In re Jaron Z.*, 348 Ill. App. 3d 239, 259, 810 N.E.2d 108, 125 (2004)).

¶ 30    In this case, respondent's visitation with P.B. was both infrequent and irregular and respondent failed to take responsibility for P.B. by providing care and financial support for P.B.  Kristy testified respondent never provided financial support for P.B., who turned five during the pendency of the case.  The evidence also showed Kristy, her mother, and Ryan were the ones who provided care for P.B.  Respondent also failed to keep in contact with P.B. when respondent was in prison from December 2015 to November 2018.  Before his imprisonment, the evidence showed respondent spent very little time with P.B., even when they lived in the same household.  Respondent did not visit P.B. when he was hospitalized and refused to sign his birth certificate when P.B. was born.  While respondent did request to see P.B. after respondent was released from prison, respondent was not home one of the times Kristy took P.B. to respondent's home.  Moreover, once the adoption petition was filed, respondent did not contact Kristy about P.B.'s well-being and did not send P.B. a birthday present.  Respondent's approximately two months of inquiring about P.B.'s well-being and seeking to see him was not reasonable concern and interest.  Here, Kristy and Ryan showed both respondent never took responsibility for P.B. and respondent did not show a reasonable degree of interest and concern for P.B.

¶ 31    Accordingly, we conclude the circuit court's finding respondent unfit based on his failure to maintain a reasonable degree of interest, concern, and responsibility for the minor child pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)) was not against the manifest weight of the evidence.

¶ 32    Since we have upheld the circuit court's determination respondent met the statutory definition of an "unfit person" on the basis of respondent's failure to maintain a reasonable degree of interest, concern, or responsibility for the minor child (750 ILCS 50/1(D)(b) (West 2018)), we do not address the other bases for respondent's unfitness finding. See *In re Tiffany M.*, 353 Ill. App. 3d 883, 891, 819 N.E.2d 813, 820 (2004).

¶ 33                        B. P.B.'s Best Interests

¶ 34    Respondent also challenges the circuit court's finding it was in the minor child's best interests to terminate his parental rights. Petitioners disagree and contend the court's finding was proper.

¶ 35    During the best-interests hearing, the circuit court focuses on the minor "child's best interests and whether those interests would be served by the child's adoption by the petitioners, requiring termination of the natural parent's parental rights." *Syck*, 138 Ill. 2d at 277, 562 N.E.2d at 184. As stated, the petitioners must prove by a preponderance of the evidence the termination of parental rights is in the minor child's best interests. See *Syck*, 138 Ill. 2d at 276-77, 562 N.E.2d at 183-84. "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not." *People v. Houar*, 365 Ill. App. 3d 682, 686, 850 N.E.2d 327, 331 (2006).

¶ 36    The evidence in this case showed P.B. considered Ryan his father and was doing well in petitioners' home. In addition to petitioners, P.B. also lived with his half-sister. They were a loving family unit and had been so for a majority of P.B.'s life. The evidence showed Ryan was the only father P.B. had known. On the other hand, respondent had very little interest in P.B. until respondent was released from prison in November 2018. Even upon release, respondent's focus was on making sure P.B. knew he was his father rather than getting to know

P.B. No evidence was presented a bond existed between respondent and P.B.

¶ 37    Accordingly, we find the circuit court's conclusion it was in P.B.'s best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 38                    III. CONCLUSION

¶ 39    For the reasons stated, we affirm the Macon County circuit court's judgment.

¶ 40    Affirmed.