2022 IL App (2d) 220056-U
No. 2-22-0056
Order filed July 8, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* A.P., K.P., L.P., and J.P., Minors | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| | ) | No. 20-JA-344 |
| | ) | No. 20-JA-345 |
| | ) | No. 20-JA-346 |
| | ) | No. 20-JA-347 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Christopher P., | ) | Christopher B. Morozin, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's finding that respondent was unfit because he did not make reasonable progress toward the return of his children during the relevant nine-month time period was not against the manifest weight of the evidence. Affirmed.

¶ 2    Respondent, Christopher P., appeals from the trial court's order finding that he was an unfit parent. The court also found that it was in the best interests of his minor children that respondent's parental rights be terminated. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    Respondent has four children with the same mother. In December 2018, the children were placed in shelter care and temporary guardianship was granted to the Illinois Department of Children and Family Services (DCFS). At that time, all were living together with respondent's mother. In February 2019, the court adjudicated the children neglected. In May 2019, the court found both parents unfit and adjudicated the children wards of the court. DCFS became involved following reports of inadequate food and shelter, as well as domestic violence and mental health issues in the home.

¶ 5    DCFS ordered respondent to cooperate and comply with the terms of a service plan. The plan required respondent to comply with the following requirements: complete a substance abuse evaluation; attend individual counseling; participate in a mental health assessment; complete a court-ordered psychological evaluation; participate in a court-ordered parenting capacity assessment; cooperate with prescribed parenting services; provide support and suitable housing for his children; and obtain full employment. Respondent's compliance with the plan's requirements was evaluated on November 25, 2019; his compliance was generally rated "unsatisfactory" for failure to engage in services.

¶ 6    DCFS prepared a subsequent compliance report after respondent was evaluated again on May 11, 2020. According to that report, respondent completed four drug screenings from December 2019 to February 7, 2020, and tested positive for marijuana three times; engaged in a mental health evaluation in March 2020; joined a waitlist for parenting education; continued to reside in the same residence; reported working but failed to provide proof of employment; and was denied referral for a court-ordered parenting capacity assessment and psychological evaluation due to substance use. Both evaluations were completed by Alisha Stewart.

¶ 7    In December 2020, the State filed a petition for termination of both parents' parental rights pursuant to section 50/1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)), identifying the relevant time period as May 8, 2019, through February 8, 2020. A trial on that motion took place in October 2021. Only respondent's parental rights are at issue in this appeal.

¶ 8                          A. Alisha Stewart's Testimony

¶ 9    Alisha Stewart, a foster caseworker with Camelot Agency, testified that she took over the children's case in August 2019. She did not speak with the prior caseworker (who no longer worked at Camelot), but gathered information from service providers and her supervisor for the period before she took over. She attempted to contact respondent monthly by phone but was unsuccessful, thus she did not speak to him until January 2020. Stewart met with both parents and verified that they understood the services they were required to complete. The parents had been continually involved with DCFS since 2017 due to reports of inadequate food and shelter, as well as domestic violence and mental health issues in the home.

¶ 10    During the period of May 2019 through November 2019, respondent's compliance with the service plan was rated "unsatisfactory." He had not kept in regular contact with either Stewart or Camelot. His rating during this period was due to failure to participate services, a consequence of his failure to keep in contact with the agency. In January 2020, he reported working out of state during this period to Stewart, but he had not documented his employment status. He was referred for mental health services and a parenting capacity assessment, but Stewart received no documentation that he completed those services; she explained, "There was concern of substance abuse services not being completed."

¶ 11    Respondent tested positive for THC three times between December 2019 and February 2020. Although he started outpatient treatment for substance abuse at Nicasa, he was discharged

due to failure to attend. He was attending therapy through Camelot as of March 2020 and was rated satisfactory for mental health services. Although respondent was referred to and eligible for parenting education through Nicasa, he had not yet completed that service. Instead, he was on a waitlist to complete classes through Camelot as of March 2020. The agency was unwilling to begin coaching until respondent was consistent with mental health services, however, despite his rating of satisfactory.

¶ 12    Respondent stated that his address continued to be the residence from which the children were removed. Although he reported working out of state, he did not provide an out-of-state address. Stewart could not recall whether she had visited respondent's stated address but did say she had not been inside the residence.

¶ 13    Respondent was offered weekly supervised visitation; he attended 6 and missed 17 scheduled visitations. While he engaged with his children, respondent showed limited parenting skills and it appeared he did not understand child development. For instance,

> "[T]here were limited parenting skills demonstrated. It appeared he did not understand child development as he would tell the children they were going home soon and telling them he did all this paperwork so the kids could come home. He was not consistent in providing snacks or meals during his visitation."

To Stewart's knowledge, the assertion that respondent had done everything required, and that all he had to do before they could return home was complete paperwork, was not true. During the transition period in which she took over the case, Stewart was aware of visits in August 2019 and September 2019, though she had not supervised them. Visitation was suspended in December 2019 based on visitation inconsistency, though respondent continued to express his desire to see his children.

¶ 14 Respondent had not sufficiently cooperated in his prescribed services for visitation to be reinstated. She recalled that respondent brought birthday gifts during one visit but could not recall whether he gave Christmas gifts. He told Stewart he had Christmas gifts for the children, but preferred to wait to give them in person. He had not otherwise provided financial support for the children. His visitation was reinstated in September 2020.

¶ 15                                    B. Respondent's Testimony

¶ 16 Respondent testified after Stewart. Prior to the removal of his children, respondent had an intact caseworker named Peter Sajovec who had asked him to undergo a mental health screening, a psychological evaluation, and a substance abuse evaluation.

¶ 17 His children were removed from his care while they were living in a trailer home owned by his mother. His mother, the children's mother, and a woman named Becky also lived there. The residence had two bedrooms and there were five pets—two dogs and three cats. Respondent still lived at that residence and had never moved out.

¶ 18 After DCFS took custody of the children, respondent became involved with a caseworker from Camelot named Sarah who "refused to call [respondent] back" and "refused to tell [him] anything." He was later assigned a new caseworker who "did not keep up to date with [him]." Respondent did not receive a copy of the service plan until June 2019, six months after the children were removed.

¶ 19 Respondent worked out of state (in Minnesota) from April 2019 to December 2019 and did not complete any services during this time. He told his caseworker he was going to be working out of state. Aside from one visit on May 25, 2019, he did not visit the children during this time because he "couldn't." Stewart "took the visitations away" from him. The only proof of employment he

provided to Stewart was a copy of a letter from his employer stating that he was paid in cash. He worked 12 to 14 hours per day, 6 days per week, on cell phone towers.

¶ 20    Respondent contacted his caseworker when he returned in December 2019. He completed "the drug class" in March or April 2020. When asked if it was possible that he merely underwent an evaluation in March and completed treatment in October 2020, respondent agreed. He said he did not test positive for cannabis when tested by Stewart and Nicasa. Respondent never completed parenting classes; he "couldn't find a parenting place" and was told by Stewart that he was not approved. He completed a psychological evaluation but did not have proof.

¶ 21                    C. The Trial Court's Findings

¶ 22    After reviewing the procedural history of the case, the trial court made its findings and concluded that the State had proved respondent was unfit:

>     "The Court's aware that [respondent], sometime after his visits were suspended in December of 2019, became a little more consistent with the caseworker, began asking for visitation with the children; but his actions speak louder than his words.
>
>     Here, based upon all of the evidence, [respondent] failed to do tasks and services in any timely fashion or form; failed to regularly visit the children prior to his visits being suspended; left the state for eight months to work, April/May of 2019 to December of 2019; failed to appear on court dates; failed to consistently -- you know, prior to his visits being suspended, consistently communicate and cooperate with caseworker; had knowledge of the tasks and services; and misled the children at visits.
>
>     The Court finds the State has met its burden of proof by clear and convincing evidence that Mr. Purpura failed to maintain a reasonable degree of interest or concern or responsibility for the four minor children.

***

As to all children and as to each minor child, the nine-month period alleged by the State is May 8th of 2019 to February 8th of 2020. During this nine-month period, the Court finds that the parents weren't regularly exercising their visits, were not completing all their tasks and services, were rated unsatisfactory, you know, during that nine-month period. The permanency order of July 16th of 2019 indicates that no parent was making any progress or involved in any tasks and services. So that would cover from May 8th of 2019 to when the June period began, June to December.

The December permanency order, again no progress. Neither parent completing tasks and services. [Respondent] not regularly visiting the children, not involved in tasks and services. His own testimony was that he had knowledge of the service plan in June of 2019. His own testimony was that he did not do tasks and services. The caseworker's testimony was that she tried to reach out to him, left messages. Visits were suspended in December of 2019. He had no visits other than the six visits, as identified in the review period of June 19th to December of 2019.

The Court recognizes that [respondent], you know, had a substance abuse evaluation and was doing some mental health services, but he was discharged from both for not attending. But those occurred in -- The evaluation, it wasn't clear, it might have been February or March. But he didn't do the services up until February 8th. And he wasn't completed with mental health services from May 8th of 2019 to February 8th of 2020.

The Court notes during that time frame the lack of completing all tasks and services, the lack of maintaining a bond and relationship with the children, the failure to appear on court dates by [respondent]. The Court finds that [respondent] did not make reasonable

progress towards return home of the children during that nine-month period as alleged by the State. The children weren't close or near in the future to be returned home to [respondent]."

This timely appeal followed.

¶ 23                                  II. ANALYSIS

¶ 24     At issue is whether the trial court erred in finding respondent unfit. Every case involving a finding that a parent is unfit is *sui generis*. *In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990). A parent may be found unfit on the ground that he or she has "fail[ed] to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2020). The State meets its burden by presenting clear and convincing evidence that a parent is unfit. *Syck*, 138 Ill. 2d at 278. If a child has been adjudicated a neglected minor, a parent may be found unfit if, during any nine-month period following such adjudication, he or she failed "to make reasonable progress toward the return of the child to the parent." *Id.* § 1(D)(m)(ii) (West 2020). Whether a parent has made "reasonable progress" is judged objectively and requires "measurable or demonstrable movement toward the goal of reunification." *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 21. The "benchmark" for determining whether a parent has made reasonable progress toward the return of the child "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child" and "other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d at 216–17; see also 750 ILCS 50/1(D)(m) (West 2020) (" '[F]ailure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan[.]").

A finding that either of the above grounds is satisfied can support a finding of unfitness. See 750 ILCS 50/1(D) (West 2020) ("The grounds of unfitness are any one or more of the following***.").

¶ 25     A trial court's finding of unfitness will be reversed only if it is against the manifest weight of the evidence. *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 68 (2005). We defer to the findings of the trial court because it is in the best position to observe and assess the credibility of witnesses. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). A finding is against the manifest weight of the evidence if is unreasonable, arbitrary, or not based on the evidence presented. *Id.* at 498. Focusing on only the ground alleging failure to make reasonable progress (which is sufficient to reach a decision), we conclude that the trial court's finding was not against the manifest weight of the evidence.

¶ 26     Respondent argues that the trial court erred in finding him unfit. First, he contends that there was not clear and convincing evidence that he failed to maintain a reasonable degree of interest, concern, and responsibility for the children. Specifically, he claims his failure to visit his children "was motivated by a need to cope with the other aspects of his life" in that he had to leave the state for eight months to work from April 2019 to December 2019. See *Syck*, 138 Ill. 2d at 279. Second, he contends that the evidence presented at trial did not establish by clear and convincing evidence that he had not made reasonable progress toward the return of his children. Specifically, he claims that Stewart had no personal knowledge of whether he was referred for services or whether he might have reached a goal established by DCFS without following specific directives.

¶ 27     We reject respondent's arguments and conclude that the trial court's finding that respondent failed to make reasonable progress toward the return of his children during the period of May 8, 2019, and February 8, 2020, was not against the manifest weight of the evidence.

¶ 28     Respondent's children were adjudicated neglected in February 2019 and adjudicated wards of the court in May 2019. After making contact with Stewart, respondent engaged with mental

health services and received a satisfactory rating. He expressed a desire to see his children and claimed he purchased Christmas gifts which he wished to give them in person. His visitation was reinstated in September 2020.

¶ 29    Nevertheless, respondent's behavior during the operative time period—May 8, 2019, through February 8, 2020—supports the trial court's judgment. Respondent testified that he last saw his children during a May 25, 2019, visit before he returned to Illinois in December 2019 from working out- of state. He received a copy of his service plan in June 2019, although he had been asked prior to the children's removal by a different caseworker to engage with some of the services described in the service plan. He was aware that Camelot was handling his case and spoke with an initial caseworker named Sarah, though he claimed she refused to return his calls. He was assigned a second caseworker before Stewart took over. He spoke to Stewart for the first time when he returned to Illinois in December 2019.

¶ 30    After making contact with Stewart, respondent tested positive for THC three times between December 2019 and February 7, 2020. He was also discharged from drug counseling classes through Nicasa for failure to attend. This led Camelot to place him on a wait list to receive parenting services. Moreover, respondent testified that he continued to live in the same home under the same conditions from which his children were removed (despite the service plan requiring him to provide suitable housing for the children), and Stewart testified that respondent provided no financial support for the children (aside from purchasing Christmas gifts).

¶ 31    Although respondent argues that he needed to work out of state to cope with other aspects of his life, this proffered justification does not excuse his lack of progress toward the return of his children prior to February 8, 2020. Setting aside that the only documentation of his employment was a letter purportedly from his employer stating that he was paid in cash, respondent fails to

explain why he could not work closer to his children or otherwise visit them regularly for approximately six months between June 2019 and December 2019.[1] Moreover, Stewart's lack of direct knowledge regarding when respondent had first been referred for services and what progress he had made prior to making contact with him is of little relevance. Defendant testified directly that, prior to speaking with Stewart, he last saw his children on May 25, 2019, and received a copy of his service plan in June 2019. Accordingly, his failure to visit his children or engage with services from June 2019 until December 2019 is attributable to his own lack of effort.

¶ 32    Respondent did not cure his failure to engage in services specified in the service plan during this period upon his return to Illinois. He was unable to promptly begin parenting services after returning due to positive drug tests and poor substance abuse treatment attendance. His inability to begin parenting services is significant given Stewart's testimony that respondent showed limited parenting skills and understanding of child development. He also failed to obtain suitable housing or provide financial support to the children. The totality of respondent's circumstances thus show a lack of reasonable progress toward reunification. See 750 ILCS 50/1(D)(m)(ii) (West 2020); *In re C.N.*, 196 Ill. 2d at 216–17.

¶ 33                               III. CONCLUSION

¶ 34    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

---

[1]The record is unclear as to whether respondent visited his children between May 25, 2019, and December 2019. Stewart testified that she was aware of two visits during August 2019 and September 2019, but respondent testified that he did not visit the children during that time frame. The trial court recognized this discrepancy, however, and stated that it gave respondent the benefit of the doubt, ostensibly finding that those two visits occurred. We accept this finding.

¶ 35    Affirmed.