NOTICE

Decision filed 06/13/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220085-U

NOS. 5-22-0085, 5-22-0084, 5-22-0083

cons.

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* G.S., W.S., and N.S., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 19-JA-210, 19-JA-211, |
| v. | ) | 19-JA-212 |
| | ) | |
| S.S., | ) | Honorable |
| | ) | Amy Maher, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's findings that the respondent mother was unfit because she failed to make reasonable efforts and progress were not against the manifest weight of the evidence. Accordingly, we affirm the court's termination of the respondent mother's parental rights.

¶ 2    The respondent mother, S.S., appeals the judgment of the circuit court of Madison County terminating her parental rights to her minor children, N.S., W.S., and G.S. On appeal, S.S. argues that the court's findings that she was an unfit parent under sections

1

1(D)(m)(i) and (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2020)) were against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 3                                        I. BACKGROUND

¶ 4       S.S. and A.R. had three children: N.S., born January 5, 2010; W.S., born January 11, 2011; and G.S., born April 24, 2012. Although A.R.'s parental rights to all three children were also terminated, this appeal only involves the termination of S.S.'s parental rights. Thus, we will only discuss those facts pertinent to the termination proceedings involving S.S.

¶ 5       On September 5, 2019, the State filed juvenile petitions, asserting that the children were neglected minors and had been placed in foster care through the Illinois Department of Children and Family Services (DCFS).[1] The petition alleged that the children were neglected under section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2018)) in that their parents did not provide the proper or necessary support, education, medical, or other remedial care for their well-being, including adequate food, clothing, and shelter. Specifically, the petition asserted that S.S. (1) had a substance abuse addiction that impaired her ability to care for the children, (2) admitted using methamphetamine, (3) was observed slumped over in a car with drugs and drug paraphernalia present, and (4) was charged with permitting the children's truancy. The petition further contended that the children were neglected in that their environment

---

[1]In the trial court, the State filed a separate juvenile petition for each child (Madison County case Nos. 19-JA-210, 19-JA-211, and 19-JA-212). However, on April 12, 2022, this court consolidated the three cases under 5-22-0085 for the purposes of the appeal.

was injurious to their welfare in violation of section 2-3(1)(b) of the Juvenile Court Act (*id*. § 2-3(1)(b)) for the same reasons.

¶ 6     That same day, the trial court entered a temporary custody order, placing temporary custody of the children with DCFS.  On October 15, 2019, a DCFS service plan was prepared, which required S.S. to complete the following tasks: (1) complete a substance abuse assessment; (2) remain in substance abuse treatment until successfully discharged; (3) cooperate with random drug tests; (4) follow all recommendations from the substance abuse provider; (5) attend monthly visits with her caseworker; (6) cooperate with court orders regarding services and visits and attend all court hearings; (7) keep the caseworker informed of any changes in address, phone number, household composition, and employment within 24 hours of the change; (8) maintain appropriate housing; (9) participate in domestic violence counseling until successfully discharged; and (10) actively participate in counseling until successfully discharged.

¶ 7     On December 3, 2019, a dispositional hearing report was filed by Caritas Family Solutions (Caritas), which stated that a case was opened in July 2019 after the children were at the emergency room with their babysitter, who admitted being under the influence of methamphetamine.  In September 2019, there was another incident in which the police responded to a call about S.S. sleeping in a car, and paraphernalia with remnants of methamphetamine and heroin were discovered with her in the vehicle.  S.S. admitted to substance use, and the children were taken into protective custody.

¶ 8     The report rated S.S.'s progress on her service plan tasks for the previous six months.  She was rated satisfactory for maintaining contact with her caseworker, attending

3

court dates, keeping her caseworker updated on her contact information, and attending monthly visits with her caseworker. However, she was rated unsatisfactory on maintaining her sobriety. The report indicated that, in November 2019, S.S. went to inpatient substance abuse treatment but left the following day against staff advice; she completed one of the two random drug tests and tested positive for amphetamines and methamphetamine; on the date of her missed drug test, she self-reported use of marijuana and Xanax that was not prescribed to her; and she was not engaged in substance abuse treatment. She was also not engaging in individual and domestic violence counseling and did not have stable housing, reporting that she was staying "here and there" or in her vehicle. She was allowed weekly supervised visits with the children, she attended all scheduled visits and interacted appropriately with the children, and the caseworker observed a bond between her and the children. The permanency goal was to return the children home within 12 months.

¶ 9 That same day, the trial court entered an adjudicatory order, finding that the children were neglected minors in that they suffered from a lack of support, education, and remedial care, and they were in an environment that was injurious to their welfare. The court also entered a dispositional order, finding that S.S. was unfit and leaving custody and guardianship of the children with DCFS.

¶ 10 On June 10, 2020, a permanency hearing report was filed that reported S.S. maintained contact with her caseworker but had not engaged in substance abuse treatment; on three occasions, she tested positive for amphetamines and methamphetamine; and she had not engaged in domestic violence counseling. Although S.S. reported that she completed a substance abuse assessment at Chestnut Health Systems (Chestnut) on March

4

26, 2020, the caseworker had not yet received any assessment or follow-up reports from the counselor.

¶ 11 On June 4, 2020, S.S. reported that she started participating in individual counseling, but she was unable to provide the counselor's name and contact information. The caseworker requested the information from the provider but had not yet received any reports. S.S. moved into a new home with her aunt in April, and she provided her address to the caseworker. However, the caseworker had been unable to complete a home safety check because of COVID-19 restrictions. S.S. was allowed two hours of supervised weekly visits with the children, and, since December, she attended 9 out of 15 scheduled visits. At those visits, she interacted appropriately with the children, and there was a bond between her and the children. In March 2020, all in-person supervised visits were suspended by DCFS due to the COVID-19 pandemic, but S.S. was allowed twice weekly video supervised visitation.

¶ 12 On June 23, 2020, the trial court entered a subsequent permanency order, finding that S.S. had not made reasonable efforts or substantial progress toward the children returning home because she had not completed all her service plan tasks. The permanency goal remained to return the children home within 12 months. On August 19, 2020, another permanency report was filed, which indicated that the caseworker was unable to get an assessment or follow-up progress reports from S.S.'s substance abuse provider because S.S. had not responded to the caseworker's request to sign a release. Since June, S.S. completed two out of three scheduled drug screens, and both were positive for methamphetamine and amphetamines. The July test was diluted. S.S. explained that she

relapsed in June because she was depressed and admitted that she had not engaged in any substance abuse services since her relapse. On July 28, 2020, S.S. disclosed that she had not engaged in mental health services during the past month. She also had not engaged in domestic violence counseling. She resumed in-person supervised visits with the children in July and was allowed once weekly, two-hour visits. S.S. failed to timely confirm for the second scheduled visit, but, since then, she attended all scheduled visits, interacted appropriately with the children, and followed all safety guidelines.

¶ 13    On November 19, 2020, a permanency report was filed, which indicated that, on July 8, 2020, S.S. was discharged from her substance abuse services. She reported that she required inpatient substance abuse treatment and was on the waiting list for an inpatient facility. She also reported that she continued to use methamphetamine, and, in September, she attempted to detox on her own but went into ketoacidosis and was hospitalized for five days. She planned to attend detox at Gateway Regional Medical Center and wanted to attend inpatient substance abuse treatment upon her release. She failed to complete the random drug screens since the last court date but admitted to continued substance use in that time. S.S. completed a mental health assessment at Chestnut on March 26, 2020, and the recommendation was for her to participate in outpatient counseling services as well as psychiatric services. However, she did not participate in those services consistently and was discharged on July 28, 2020. She also had not engaged in domestic violence counseling. In September, a report was made to the DCFS hotline that there was a possible methamphetamine laboratory in the residence where S.S. was living. The caseworker

6

indicated that possible substance use and manufacturing in or around the home continued to be a safety concern.

¶ 14   S.S. attended approximately three of her four monthly visits with the children.  At one visit, she appeared to be struggling to stay awake and blamed it on low blood sugar. During another visit, her blood sugar levels climbed throughout the visit to the point that she began making comments that did not make sense, and she felt like she was zoning out. The visit was ended early so she could obtain medical treatment.  During visits, she interacted appropriately with the children, used appropriate discipline when necessary, and divided her attention between the children.

¶ 15   On December 3, 2020, the trial court entered a subsequent permanency order, finding that S.S. had not made reasonable efforts or substantial progress toward the children returning home because she had not completed all her service plan tasks.  The permanency goal remained to return the children home in 12 months.  On February 16, 2021, another permanency hearing report was filed, which reported that S.S. maintained contact with the caseworker.  On November 30, 2020, she completed a substance abuse assessment at Chestnut, and it was recommended that she engage in intensive outpatient treatment, but she failed to attend any scheduled group sessions and was discharged on December 31, 2020.  She had not completed a new substance abuse assessment.  She completed one of three drug tests since December, and on December 23, 2020, she tested positive for amphetamines and methamphetamine.  Although she was referred to Oasis Women's Center for domestic violence counseling, she did not attend counseling there.  The

caseworker reported that she received multiple reports in the past month that S.S. was no longer living in her aunt's home and was instead living in a hotel.

¶ 16    On March 2, 2021, the trial court entered a subsequent permanency order, finding that S.S. had not made reasonable efforts or substantial progress toward the children returning home because she had not completed all her service plan tasks. The permanency goal was changed to substitute care pending a determination of parental rights.

¶ 17    On June 29, 2021, Caritas filed a best-interests report, which recommended that the parental rights of S.S. and A.R. be terminated, and the children remain in DCFS care with a permanency goal of adoption. In the report, S.S. was rated satisfactory for maintaining contact with her caseworker, but the caseworker noted that, during the past six months, S.S. moved multiple times and failed to update her address each time. She was rated unsatisfactory for obtaining and maintaining her sobriety because, although she started inpatient substance abuse treatment in November 2019, she left the day after arriving against staff advice. She was also discharged from Chestnut in July 2020 for failing to attend the recommended outpatient treatment and again discharged from Chestnut in December 2020 for failing to engage in the recommended intensive outpatient treatment. She completed 10 of the 20 random drug tests, and all completed tests were positive for amphetamines and methamphetamine. She also self-reported use of methamphetamine and Xanax that was not prescribed to her.

¶ 18    S.S. was also rated unsatisfactory for individual counseling because she was discharged from those recommended services on July 28, 2020, and she failed to complete

8

a new assessment or engage in individual counseling through another provider. Similarly, she was rated unsatisfactory for domestic violence counseling for failure to engage.

¶ 19 S.S. was further rated unsatisfactory for appropriate housing because she never had safe and stable housing. She initially reported living with her mother and sister but then left because of their substance use and because she got into a physical altercation with her sister. She then reported living "here and there" or in her car until she obtained housing with her aunt in April 2020. In September 2020, a hotline report was made regarding a possible methamphetamine laboratory in the home while children were present. Although S.S.'s children had never been present in the home, there were still safety concerns about substance use and manufacturing in or around the home. She then stayed with various friends or family members or in a motel until she moved back in with her mother and sister following a weeklong stay in the hospital due to diabetes complications in early June.

¶ 20 As for S.S.'s scheduled visits with the children, she was allowed once monthly supervised visits for two hours. She attended her monthly visit in April and June but failed to attend the May visit due to being hospitalized. When she was allowed weekly supervised visits, she attended three or four of the visits each month and frequently ended the visits early. During the visits, she interacted appropriately with the children, used appropriate discipline when necessary, and divided her attention between the children. Although there were no safety concerns during the visits, the caseworker noted that the children did not appear to respond to S.S.'s discipline, and, during more recent visits, N.S. did not interact with S.S. as much and either sat on his own or attempted to talk with the caseworker instead.

¶ 21    On July 9, 2021, the State filed a petition for termination of parental rights and for appointment of a guardian with the power to consent to adoption, asserting, *inter alia*, that S.S. was unfit to have children under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)) in that she failed to make reasonable efforts to correct the conditions that were the basis for the children's removal during any nine-month period after the adjudication of neglect, and under section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)) in that she failed to make reasonable progress toward the children's return during any nine-month period after the adjudication of neglect.  The State identified the following as the relevant time period: December 3, 2019, through the filing of the petition. On July 13, 2021, the trial court entered a subsequent permanency order, maintaining the same permanency goal of substitute care pending a determination of parental rights.

¶ 22    On October 5, 2021, Caritas filed another best-interests report, which indicated that S.S. had moved in with a friend after her mother kicked her out of the home, and she had provided the new address to her caseworker.  S.S. completed a new substance abuse assessment at Chestnut in September 2021, and it was recommended that she engage in outpatient substance abuse treatment because she was unable to attend inpatient treatment for medical reasons.  Although she was assigned a counselor, she had not participated in the recommended groups.  She completed a drug test on September 22, 2021, which was positive for amphetamines and methamphetamine and presumptive positive for fentanyl. The results from her October 1, 2021, drug test were pending.  She completed a new mental health assessment at Chestnut in July 2021, and it was recommended that she engage in outpatient mental health services.  However, she did not engage in recommended mental

health treatment. She attended her monthly visits with the children in July and August but failed to attend her September visit due to being hospitalized. W.S. informed his caregivers that he felt pressured to attend the visits because N.S. and G.S. did not interact with S.S. as much.

¶ 23 Another best-interests report was filed on December 3, 2021, which indicated that S.S.'s October 1, 2021, drug test was negative, but she tested positive for marijuana on October 29, 2021. The results from her November 29, 2021, drug test were pending.

¶ 24 At the December 16, 2021, fitness hearing, Sarah Vagnais, a Caritas caseworker, testified that she was assigned to S.S.'s case in September 2019, when the children were taken into protective custody after S.S. was discovered sleeping in a car containing drug paraphernalia, and S.S. admitted to recent methamphetamine use. At that time, there was already an open case because the children's babysitter had taken them to the hospital while the babysitter was under the influence of methamphetamine.

¶ 25 Vagnais created S.S.'s service plans with the following services: cooperate with Caritas, obtain and maintain sobriety, participate in domestic violence counseling, engage in mental health treatment, and obtain and maintain safe and stable housing. Vagnais testified that S.S.'s cooperation with Caritas was fairly good in that S.S. kept in contact at least once per month either through phone calls or meetings. However, S.S. did not provide timely updates of her address and phone number, and there were long periods of time where Vagnais could not contact her. S.S. was referred to Chestnut for her mental health services, and she completed her first assessment in April 2020. She then attended one session but was discharged in July 2020 because she did not return for subsequent sessions. She

completed another assessment in November 2020 but was again discharged in December 2020 because she failed to attend the sessions. She completed a third assessment in July 2021, but Vagnais did not have an updated release to obtain any information as to whether S.S. engaged in treatment.

¶ 26 As part of obtaining and maintaining sobriety, S.S. was required to cooperate with periodic random drug tests and participate in substance abuse treatment. In November 2019, she attended inpatient substance abuse treatment for one day but then left against staff advice. She completed a mental health assessment in March 2020 and was referred to outpatient treatment but was discharged in July 2020 for failure to attend. She completed another assessment in November 2020 and was referred to intensive outpatient treatment but was again discharged in September 2020 for failure to participate. She completed a third assessment in September 2021, and they recommended inpatient treatment, but due to medical reasons she could not attend, so they recommended outpatient treatment instead. Initially, she did not participate in the outpatient treatment, and Vagnais did not have an updated release to obtain an update.

¶ 27 S.S. completed 14 out of 27 drug tests, 11 were positive for methamphetamines, one was positive only for marijuana, and she had two clean drug tests. Her most recent positive drug test was November 22, 2021. Vagnais acknowledged that the three drug tests S.S. had taken since September 2021 were all negative for methamphetamine. She never completed an assessment for domestic violence counseling, so she had no services for domestic violence.

12

¶ 28    Initially, S.S. was living with her mother and sister, but she moved out after getting into a physical altercation with her sister. She also reported that her mother and sister were abusing substances while she was living there. She then lived with various friends and family until she and her aunt moved in together in April 2020. A few months later, Vagnais received a police report of drug activity in the home. Thereafter, S.S. reported that she lost the home; Vagnais believed that S.S. said the home burned down. She then moved back in with her mother and sister, but in September, she moved to Centralia to stay with friends.

¶ 29    S.S. was originally permitted once per week supervised visits with the children, but once the permanency goal was changed to substitute care, her visits were reduced to once per month. She missed approximately one visit per month during her weekly visits, and, since the reduction in visits, she missed one visit because she was in the hospital. During visits, her interactions with the children were mostly appropriate, but there were a few times where the children got visibly upset. There had also been numerous visits where N.S. minimally interacted with S.S. and sat with Vagnais instead of S.S. There were a few visits where S.S. brought items for the children, such as a bag of clothes and shoes or jewelry. Vagnais believed that S.S. was unfit because she had not made any progress on her service plan since the case was opened. Vagnais explained that S.S. had not shown a significant amount of sobriety or consistently engaged in any of her services.

¶ 30    In a letter submitted to the trial court, S.S. reported that she had not used methamphetamine in 77 days, she moved to Centralia to distance herself from her previous life, and she was participating in a women's recovery group through Chestnut. She also stated that she had been working up to 10 hours per week, and she completed her housing

authority application. Since she recently discovered that she was required to complete a domestic violence prevention course, she had attempted to find a course near her home, but none of the groups have returned to in-person classes.

¶ 31 After hearing the evidence, the trial court found that S.S. was unfit in that she failed to make reasonable progress and efforts for the return of the children during any nine-month period following the court's adjudication of neglect. The cause then proceeded to the best-interests hearing.

¶ 32 Vagnais testified that the children were currently in two separate traditional foster homes. Initially, the children were placed in the same residence, but W.S. was moved into a different home in August 2021 because he had some aggressive behaviors and was a danger to the other children in the home. N.S. and G.S. lived in a home with a foster mother and father, who had four biological children between the ages of 2 and 14. W.S. lived in a home with a foster mother and father; they had two biological children, ages 12 and 14. Vagnais observed that all of the children were very comfortable in their respective homes, they sometimes referred to their foster parents as mom and dad and the other children as brothers and sisters, they had their own spaces, and they talked about the future. W.S. excelled in his new home and received an award from school for how well he was doing.

¶ 33 Vagnais continued to check in with the children about being separated from each other, but they all reported that the arrangement was working well for them. Vagnais explained that they were getting along better since the new placement. They all attended the same church, and they had additional visits outside of church. The foster parents were

employed, the homes exceeded DCFS standards, and the parents were able to meet the children's needs.

¶ 34    Vagnais acknowledged that the children referred to S.S. as mom during their visits, there was a noticeable bond between S.S. and the children, and the children seemed to enjoy the time they had with her. However, Vagnais explained that the children wanted to be adopted by their foster families and understood that they might not have contact with S.S. if they were to be adopted. They expressed that, if S.S. was in a safe place in the future, then they would consider further contact with her. The foster parents were open to the idea of the children having a future relationship with S.S. as long as they felt it was safe.

¶ 35    Vagnais did not believe that it would be detrimental to the children if S.S.'s parental rights were terminated because, although the children loved her, they recognized that she could not take care of them, and they had been asking to be adopted. Thus, she expressed her opinion that S.S.'s parental rights should be terminated, so the children could be adopted.

¶ 36    The guardian *ad litem* then recommended that S.S.'s parental rights be terminated and the children be eligible for adoption. After hearing the testimony and the guardian's recommendation, the trial court found that it was in the children's best interests that the parental rights be terminated and they be eligible for adoption. In making this decision, the court noted that the children had been in care for more than two years, they were bonded in their respective homes, they were in stable and secure living arrangements, and it was

time for them to have permanency. The court expressed hope that S.S. would have a relationship with the children in the future but noted it was too tenuous at this point.

¶ 37 That same day, the trial court entered a written order reiterating its findings that S.S. was unfit in that she failed to make reasonable efforts and progress to the children's return home during any nine-month period following the adjudication of neglect, specifically December 3, 2019, through the date of the filing of the termination petition. The order also reiterated the court's finding that termination was in the children's best interests, noting that the foster parents wished to adopt the children and had signed permanency commitments; the children were strongly bonded to their foster families; and the children's emotional, psychological, and financial needs were being met in the foster homes. S.S. appeals.

¶ 38                                    II. ANALYSIS

¶ 39 On appeal, S.S. challenges the trial court's decision to terminate her parental rights, arguing the unfitness determinations were against the manifest weight of the evidence. She does not challenge the court's best-interest determinations.

¶ 40 Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re D.F.*, 201 Ill. 2d 476, 494 (2002). A petition to terminate parental rights is filed under section 2-29(2) of the Juvenile Court Act, which delineates a two-step process in seeking to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2020). It must first be established, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of

16

the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *In re D.F.*, 201 Ill. 2d at 494-95. Because each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 41 Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re C.P.*, 191 Ill. App. 3d 237, 244 (1989). Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004). The burden of presenting clear and convincing evidence of unfitness is on the party petitioning for adoption. *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 67-68 (2005). A finding of parental unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d at 498. A trial court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). A reviewing court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 42 Here, the trial court found S.S. unfit on the following two grounds: (1) she had not made reasonable efforts to correct the conditions that led to the removal of the minor

children from her care during any nine-month period following the adjudication of neglect and (2) she had not made reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect.

¶ 43   Reasonable efforts and reasonable progress are two distinct grounds of unfitness under section 1(D)(m). *In re Daphnie E.*, 368 Ill. App. 3d at 1066. Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the children and are judged by a subjective standard based upon the amount of effort that is reasonable for a particular person. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. For reasonable efforts, the trial court must determine whether the parent has made earnest and conscientious efforts toward correcting the conditions that led to the removal of the minor children from the home. *Id.*

¶ 44   In contrast, reasonable progress is judged using an objective standard that focuses on the amount of progress toward the goal of reunification one can reasonably expect under the circumstances. *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999). Reasonable progress is measured from the conditions existing at the time of removal. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 37. It requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. The standard by which progress is measured is the parent's compliance with the trial court's directives and the service plans in light of the conditions that gave rise to removal and other conditions that later become known and would prevent the court from returning custody of the child to the parent. *Id.* There is reasonable progress when the court can conclude that it will be able to return the children to parental custody in the near future. *Id.*

18

¶ 45   The State identified the relevant period for reasonable efforts and progress as December 3, 2019, through the date of the filing of the petition for termination.  The minor children were removed from S.S.'s care in September 2019 after she was discovered sleeping in a car containing drug paraphernalia and after she admitted to recent methamphetamine use.  Her service plan tasks were to cooperate with Caritas, obtain and maintain sobriety, participate in domestic violence counseling, attend mental health treatment, and obtain safe and stable housing.

¶ 46   Although she generally cooperated with Caritas, obtained her substance abuse assessments, and completed most of the requested random drug tests, she never made reasonable progress or efforts toward treating her substance abuse addiction.  In November 2019, she participated in inpatient substance abuse treatment for only one day before leaving against staff advice.  In March 2020, she was referred for outpatient treatment but was discharged for failing to attend.  In November 2020, she was referred for intensive outpatient treatment but was again discharged for failing to attend.  She completed 14 out of the 27 random drug tests, but 11 were positive for methamphetamine.  It was not until the months immediately preceding the termination proceedings that S.S. exhibited any meaningful efforts to discontinue her use of methamphetamine.  Further, although she completed her mental health assessments in April and November 2020, she was discharged from treatment for failure to attend.

¶ 47   Throughout the relevant time period, S.S. did not have stable housing, living in different places with various friends and family members until she eventually moved to Centralia to live with a friend.  She never completed services for domestic violence, and

even though she claimed that she was not aware that she was required to do these services, she acknowledged that she received the service plans, which included domestic violence services. Since the December 2019 adjudication of neglect, S.S. failed to make any reasonable efforts or progress, and while her recent efforts, especially with regard to her substance abuse issues, are commendable, those last-minute efforts are simply too late. See *In re Grant M.*, 307 Ill. App. 3d 865, 871 (1999) (a parent does not have unlimited time to make reasonable efforts or progress toward regaining custody of the children). Thus, based on the record evidence, we conclude that the trial court's findings that S.S. was unfit for lack of reasonable efforts and reasonable progress toward the goal of reunification were not against the manifest weight of the evidence. Accordingly, we affirm the trial court's termination of her parental rights.

¶ 48                                    III. CONCLUSION

¶ 49   For the foregoing reasons, we affirm the judgment of the circuit court of Madison County.


¶ 50   Affirmed.