# Illinois Official Reports

## Appellate Court

---

### *In re Nicholas C.*, 2017 IL App (1st) 162101

---

| | |
|---|---|
| Appellate Court Caption | *In re* NICHOLAS C. and NATHAN W., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Mandi C., Respondent-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-16-2101 |
| Rule 23 order filed<br>Rule 23 order withdrawn<br>Opinion filed | March 29, 2017<br><br>April 25, 2017<br>May 10, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 11-JA-00083, 11-JA-00084; the Hon. Andrea Buford, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Amy P. Campanelli, Public Defender, of Chicago (Marsha Watt, of counsel), for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Leslie Billings, Assistant State's Attorneys, of counsel), for the People.<br><br>Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), guardian *ad litem*. |

Panel                     JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Cobbs concurred in the judgment and opinion.

## OPINION

¶ 1        Mother/respondent-appellant Mandi C. appeals from the Cook County circuit court's order in the instant cause finding her to be unfit under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2012)) and ordering the termination of her parental rights over Nicholas C. and Nathan W., her minor children. She contends that the trial court's determination was "not supported by clear and convincing evidence" and was made "contrary to the manifest weight of the evidence." She asks that we reverse its decision, remand this cause, and vacate the permanency goal of adoption, the order terminating her parental rights, and the appointment of a guardian with the right to consent to the children's adoption. The State and the minors' public guardian have filed appellees' briefs. For the following reasons, we affirm.

¶ 2                                        BACKGROUND

¶ 3        Nathan was born on September 24, 2006, and Nicholas was born on May 24, 2010, to respondent, their biological mother.[1] This cause was initiated in February 2011, when the State filed petitions for adjudication of wardship alleging that the boys were neglected due to injurious environment and abused due to physical abuse and substantial risk of physical injury. With respect to eight-month-old Nicholas's petition, the State cited a prior indicated report of respondent for substance abuse; that he had sustained abusive head trauma, extensive retinal hemorrhaging, and intracranial hemorrhaging in January 2011 exhibiting both old and new head injuries and shaken baby syndrome, requiring that he be placed on life support; and that respondent's explanations were not consistent with his injuries. With respect to the petition for four-year-old Nathan, who is autistic, the State asserted that he was neglected and abused in that his brother had sustained these injuries and respondent's explanations for them were inconsistent. On August 21, 2012, the trial court held an adjudicatory hearing, finding both boys to be abused or neglected, and entered dispositional orders finding respondent unable for some reason other than financial circumstances alone to care for, protect, train, or discipline them. The boys were declared wards of the court, and temporary custody was given to the Illinois Department of Children and Family Services (DCFS).

¶ 4        Following this, several permanency hearings were held. Initially, in August 2012, the reunification goal was set at return home within 12 months, with the court noting that respondent had made "some progress" in her assigned services. Thereafter, respondent was able to obtain an order for supervised visits and, later, unsupervised visits. However, by the next permanency hearing in January 2013, the court found that respondent had not made substantial progress and set a goal of return home pending status. The court determined that respondent had not engaged in all her assigned services, namely, individual therapy and a

---

[1]The boys have different biological fathers; neither father is involved in this appeal.

psychiatric evaluation. The trial court kept the same goal at the subsequent permanency hearing in April 2013, again noting that while respondent had made "good progress," she still needed to engage in services, this time, urine drops. Then, following reports made by her therapist and those assigned to her case indicating that respondent was not participating in individual therapy and was testing positive at urine drops, the trial court, in November 2013 changed the reunification goal to substitute care pending determination on termination of parental rights, citing that respondent was not engaged in services or visiting consistently.

¶ 5        In April 2014, the State filed petitions for appointment of guardian with the right to consent to adoption for Nathan and Nicholas. The State premised its allegations of respondent's unfitness on sections 1(D)(b) and 1(D)(m) of the Adoption Act (ground (b) and ground (m)) (750 ILCS 50/1(D)(b), (D)(m) (West 2012)), asserting that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the boys' welfare and that she failed to make reasonable efforts to correct the conditions that were the basis of removal and failed to make reasonable progress toward return of the children within any nine-month period following their adjudication.[2] With respect to ground (m), the State identified the nine-month time period as August 21, 2012, to May 21, 2013.

¶ 6        In June 2014, Charisse C., respondent's mother, filed a petition for private guardianship of the boys. Briefly, during a hearing on this petition, Mattie Franklin, their DCFS caseworker, testified that Charisse had attended a staffing in September 2013, at which time Franklin asked her why she did not offer care for the boys, to which Charisse responded that she did not want the boys placed with her, as she had raised her own children and wanted to move on with her life. Franklin further testified that she told Charisse the reunification goal would soon be changed to termination but Charisse was still not willing to adopt them. Charisse testified as to her visitation with the boys, her awareness of their special needs, her desire to maintain contact with their foster parent, and her confusion with respect to petitioning for them; she stated that she would have done so earlier but was told she could not have them since respondent was living with her. Respondent supported Charisse's petition. On cross-examination, Charisse admitted that on three separate occasions in 2011, Nicholas sustained head injuries while in respondent's care but while living in her (Charisse's) home; he hit his head on the ceramic floor, he was dropped midway down the stairs and hit his head on the concrete floor at the bottom, and his head became wedged between his crib and the wall. Nicholas was not taken to the doctor, but Charisse stated that when she eventually noticed something seemed to be wrong with him, she made sure he saw one. Additional evidence indicated that there was concern about Charisse's paramour, whose background could not be approved due to criminal charges. The trial court denied Charisse's petition for private guardianship, finding, among other reasons, that she was "not credible."

¶ 7        The cause then moved to an unfitness hearing regarding respondent. Jim Boggess, her case management director, testified that he approved respondent's 2011 integrated assessment report and attended team meetings regarding the boys. The report indicated that the cause came to DCFS's attention when Nicholas was brought to the hospital with old and new brain injuries, was diagnosed with shaken baby syndrome, and was placed on life support.

---

[2]The State's petitions also sought an unfitness finding pursuant to section 1(D)(k), alleging that respondent was a habitual addict. 750 ILCS 50/1(D)(k) (West 2012). However, the State later voluntarily dismissed this ground without prejudice.

Respondent expressed guilt and remorse but was not able to provide an adequate explanation for his injuries, nor did she deny that she or anyone in the household injured Nicholas. Respondent also had a prior indicated report with DCFS for drug use, including marijuana and crystal meth. She stated during the assessment that she continued to use marijuana, that Nicholas was born premature and substance exposed, and that she had not obtained prenatal care while pregnant; she also used marijuana in the presence of her children. When she gave birth to Nicholas, respondent decided to place him for adoption but then felt guilty and reclaimed him. Nicholas was also born with plagiocephaly, but respondent did not have him regularly wear a helmet as instructed by doctors. With respect to Nathan, respondent exhibited issues in disciplining him, due to his autism. Boggess testified that while the assessment indicated respondent loved her children, she lacked understanding or concern for them and she required mental health services, as well as parenting skills, substance abuse treatment, and other recommended services.

¶ 8    Angela Thomas, a substance abuse counselor, testified that she worked with respondent after an assessment recommended intensive outpatient treatment for marijuana and alcohol abuse. Respondent successfully completed this treatment, and it was recommended that she continue with outpatient treatment. Some months later, respondent told Thomas that she had obtained a new job and wanted to work with her during individual sessions. Thomas agreed and told respondent to bring verification of her employment. Respondent never did. Thereafter, respondent's urine drop tested positive for cocaine, and she was placed on a behavioral contract, which required her to obtain a sponsor and attend further treatment. Respondent did not do so and stopped attending sessions. Respondent's outpatient treatment was terminated unsuccessfully.

¶ 9    Dr. Paul Cantz testified that he provided psychotherapy for respondent as part of her services, and his case notes and clinical summaries were submitted into evidence. Dr. Cantz noted for the court that, while respondent had made some progress therapeutically, she tested positive for cocaine and had begun attending her Narcotics Anonymous meetings with decreased frequency. He further stated that she had ambivalence regarding addiction counseling and that this indicated her continued need for both psychotherapy and drug counseling services.

¶ 10    Erin Paavola, respondent's in-home family therapist, testified that she provided services to respondent from January 2012 to January 2013 and prepared a treatment plan to address both her drug use and her parenting practices. Initially, she met with respondent once a week but then increased their meetings to twice a week, as needed. However, respondent did not keep her appointments and did not meet with Paavola on a regular basis. Paavola noted she was not invested in the therapy and she did not demonstrate that her children were a priority; she also continued to use marijuana. Paavola encouraged respondent to continue with the therapy, but while she was sometimes receptive, there were weeks where Paavola did not hear from her. Throughout her time with respondent, Paavola had terminated her from therapy twice for her failure to attend, but each time Paavola took her back. In December 2012, Paavola terminated her for the last time. Paavola opined that while respondent had made limited progress in therapy and that she undoubtedly loved her children, she did not continue to make progress and did not accept her responsibility to parent, to assess her children's needs, and to put their needs before hers. She further indicated that respondent was psychologically dependent on other people for motivation and direction and, because of this, showed a lack of parenting judgment,

particularly in terms of their safety. Paavola recommended that respondent undergo a psychiatric evaluation.

¶ 11    Tracy Vinson, a social worker who provided individual therapy for respondent, testified that she began working with her in February 2013 and set particular treatment goals. Initially, respondent attended sessions consistently, not missing any between February and April 2013 and progressing toward some goals. However, respondent then began to miss appointments without contact to reschedule and, in July 2013, Vinson terminated her from therapy. In late August 2013, respondent returned to Vinson with her caseworker, and Vinson allowed her to re-engage in therapy. However, respondent only participated in one session and failed to attend any others and concurrently became inconsistent in her visitation with the boys, admitting she was being neglectful toward them. She told Vinson that she had become depressed about having to again live with her mother, which began in June 2013, and while she was upset that the boys were distraught over her absences, she stated that not having transportation was a problem. However, respondent was able to take public transportation and received monthly bus passes from her service provider but did not always use them. By October 2013, after several more missed appointments, Vinson terminated respondent from therapy. Vinson opined that respondent needed to continue individual therapy, as it did not appear she was able or willing to assume parenting the boys.

¶ 12    Franklin, respondent's case manager from April 2011 to April 2015, testified that individual therapy, substance abuse treatment, random urine drops, parent coaching services, parenting classes, and autism support group participation were all required services for respondent for reunification. Initially, respondent had only supervised visits with the boys, but by late 2012, she was being consistent in her services and visits and, thus, obtained unsupervised day visits. However, by June 2013, Franklin had to suspend these visits, as respondent failed to make substantial progress in her individual therapy requirement, her visits with the boys became less consistent even though she had been given bus passes, she was living in her mother's home where Nicholas had been injured, and she would otherwise not disclose her whereabouts. Upon Paavola's recommendation, Franklin added a psychiatric evaluation to respondent's service plans. Franklin testified that, although she made referrals for respondent to complete the evaluation, respondent never did. Respondent also failed to participate consistently in her required urine drops and Narcotics Anonymous/Alcoholics Anonymous meetings in 2013-14. And, in October 2012, respondent told Franklin she was employed; however, she never provided proof of this, as Franklin requested. Franklin later lost contact with respondent for three months. Based on all this, by March 2014, Franklin issued respondent's overall progress rating as "unsatisfactory" and recommended the permanency goal be changed to substitute care pending termination of her parental rights.

¶ 13    Patricia Herrod, a pastoral care counselor, testified on respondent's behalf, stating that in 2012, respondent joined a support group at her health center dealing with stress, anxiety, depression, and grief, as well as a parenting group. Respondent participated and graduated from these in March 2013 and continued to attend their meetings on a weekly basis. Herrod noted that respondent expressed to her a strong desire to be a good mother and for reunification with her children.

¶ 14    John Bedalow, a parenting coach, also testified on respondent's behalf, stating that he worked with her from 2011 to October 2012. Bedalow noted that respondent demonstrated her use of his various teaching techniques, that she had become "pretty consistent" in applying

- 5 -

them, and that "she was doing fine" with respect to what he saw. However, Bedalow's final October 2012 report indicated that respondent "continues to struggle with her application" of these, and Bedalow never addressed Nicholas's abuse with her. Bedalow opined that respondent and the children had a loving relationship, but he refused to opine regarding whether she could effectively parent them in the future.

¶ 15 At the close of the hearing, the trial court issued its findings with respect to unfitness. As to ground (m), the failure to make reasonable effort or progress to return home within the cited nine-month time period of August 21, 2012, to May 21, 2013, the court found that the State had failed to meet its burden. The court reviewed the cause and the events within that time frame and noted that respondent had made some reasonable effort and progress toward the end of that cited period, as the agencies had actually allowed her to have unsupervised day visits with the children and the evaluations at the first few permanency hearings until April 2013 indicated she had made "good progress" toward reunification. The court further commented that, although her efforts were ultimately unsuccessful, respondent had still made some progress during the specified time and, thus, could not be found unfit under ground (m).

¶ 16 However, the court went on to find respondent unfit pursuant to ground (b). After summarizing for the record the various events testified to in the cause, the court noted that under ground (b), it was to examine the efforts respondent made to maintain a reasonable degree of interest, concern, or responsibility with respect to the boys, given respondent's particular circumstances. The court made clear that it would "focus on the reasonableness of her efforts and not on their success." Accordingly, it noted that respondent initially maintained regular contact with the boys for the most part and showed interest in them; it further acknowledged that she obviously loves them and has even, pursuant to some testimony, demonstrated the use of some parenting techniques she learned during her services. However, the court also noted that respondent had been unsuccessfully terminated from essentially all of her required services: she was terminated from individual therapy three times, she was terminated from parent coaching, she never completed her required psychiatric evaluation, she tested positive for drugs on several urine drops, and she had yet to obtain safe housing and stable employment. After considering all this, the court stated that respondent's failure to complete services, keep her children a priority in her life, commit to a substance-free lifestyle, and maintain a safe environment demonstrated that the State had met its burden and proved, by clear and convincing evidence, that respondent had failed to maintain a reasonable degree of interest, concern, or responsibility for the boys.

¶ 17 The cause then proceeded to a best interests hearing. Briefly,[3] testimony was presented that Theresa W. became the boys' foster parent when Nathan was 4 years old and Nicholas was 11 months old. At the time, Nathan was neither verbal nor toilet trained, and he was physically aggressive and antisocial; Nicholas cried and screamed, did not begin to walk until 23 months old, and did not begin to speak until he was 30 months old. By January 2016, assessments indicated that the boys had improved significantly and had become bonded to Theresa, who was deemed an appropriate caregiver with a good understanding of their special needs, provided a safe environment for the boys, and wanted to adopt them. In Theresa's care, the

---

[3]Again, for the record, respondent challenges only the unfitness finding on appeal and does not challenge the best interests determination of her cause. Accordingly, we present a more general overview of that hearing, as we need not detail all the evidence presented.

boys' medical needs were being met, and Nathan received special education services. Evidence did show that during visits, respondent was appropriate with the boys and they clearly enjoyed having contact with her and their extended family. However, at Charisse's home, where respondent was living, there were still a number of people living there and/or having access to the house, indicating that there was still a risk at that home. Recommendations to the trial court from the agencies involved were that the boys remain in their current placement and be adopted by Theresa. Reviewing the entire history of the case and finding Theresa to be a credible witness who had cared for the boys for over four years—the majority of their lives—the court found it to be in their best interests to appoint guardianship to DCFS with the right to consent to their adoption, thereby terminating respondent's parental rights.

¶ 18                                    ANALYSIS

¶ 19      Respondent's sole contention on appeal is that the trial court's finding of unfitness based on section 1(D)(b) of the Adoption Act was against the manifest weight of the evidence. She asserts that the evidence clearly demonstrated she showed a reasonable degree of interest, concern, and responsibility toward Nathan and Nicholas, as she made efforts to, and did, comply with services and visited her children. She then cites, as further support for her contention of error, the fact that the "trial court concede[d]" she made reasonable progress at reunification within the nine-month period cited by the State, *i.e.*, its finding that the State failed to prove her unfit under ground (m). All this, she insists, requires us to reverse and vacate the finding of unfitness, the subsequent best interests finding, and the appointment of a guardian with authority to consent to the boys' adoption and, instead, remand the cause for proceedings consistent with a goal to return home to her. We disagree.

¶ 20      Before discussing the underlying merits here, we wish to clarify for respondent our view—and the law—with respect to her assertion that, because the trial court did not find her unfit under ground (m) as the State sought in its petitions, the evidence clearly could not support the court's other finding that she was unfit under ground (b). Undoubtedly, respondent's argument is a *non sequitur*. That is, it is well established that the grounds for finding parental unfitness under section 1(D) of the Adoption Act stand independently of each other. See *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004); *In re E.O.*, 311 Ill. App. 3d 720, 726 (2000); accord *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005) (a finding under any one of the grounds listed in section 1(D), standing alone, is sufficient to establish such unfitness). Accordingly, when a trial court makes a finding of unfitness under one of its grounds, we may affirm that finding of unfitness regardless of the court's findings with respect to any other ground asserted in the petition at issue. See *Jaron Z.*, 348 Ill. App. 3d at 259 (citing *E.O.*, 311 Ill. App. 3d at 726, and *In re C.L.T.*, 302 Ill. App. 3d 770, 772 (1999) ("a finding of parental unfitness may be based on evidence sufficient to support any *one* statutory ground, even if the evidence is not sufficient to support other grounds alleged" (emphasis in original))).

¶ 21      In the instant cause, it is true that the trial court found the State had failed to meet its burden to prove respondent unfit under ground (m) by clear and convincing evidence. Without fully reviewing this cause with respect to ground (m), we are inclined to agree with the trial court's decision. As that court pointed out, when this cause was first screened into the system and particularly during the nine-month period cited by the State in its petitions of August 21, 2012, to May 21, 2013, the evidence indicates that respondent was, indeed, making "some" and even "good" progress toward reunification with Nathan and Nicholas, having entered into services,

visited them consistently, and provided negative urine drops. Respondent was even able to obtain unsupervised day visits with the boys during this nine-month period. These are accomplishments for that time of which she should be proud, as we were. However, as we will discuss in more detail below, ground (b), unlike ground (m), has no time constraint that limits a court's consideration of a parent's fitness. *In re Dominique W.*, 347 Ill. App. 3d 557, 567-68 (2004). Therefore, and again unlike ground (m), a court may consider the parent's conduct in this respect *in toto* and is not forced to analyze only certain time periods of the parent's behavior. See *Dominique W.*, 347 Ill. App. 3d at 567-68 (2004).

¶ 22    Accordingly, while we again praise respondent for the progress she made early on in the context of this cause between August 2012 and May 2013, and while we would most likely otherwise support the trial court's conclusion that the State failed in its burden to prove her unfit under ground (m) for the particular nine-month period it cited in its petitions (were we called upon to review it), we make clear that the fact that the trial court so held has no impact upon the finding appealed from here, namely, the trial court's finding of unfitness under ground (b), nor on our decision regarding that particular finding. Rather, it is only that substantive and independent ground which respondent now challenges, and it is only that substantive and independent ground which is relevant to our review herein.

¶ 23    Having made this clear, we now turn to the merits of the instant appeal.

¶ 24    A parent may be found unfit under ground (b) if that parent fails "to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2012). The language specified in this ground is disjunctive. See 750 ILCS 50/1(D)(b) (West 2012); *Jaron Z.*, 348 Ill. App. 3d at 259 (citing *C.L.T.*, 302 Ill. App. 3d at 773). Therefore, any of its three elements—the failure to maintain a reasonable degree of interest *or* concern *or* responsibility as to the child's welfare—may be considered on its own as a basis in determining whether the parent is unfit. See *Jaron Z.*, 348 Ill. App. 3d at 259 (citing *C.L.T.*, 302 Ill. App. 3d at 773). A finding of unfitness under ground (b) is based on a subjective analysis. See *In re Gwynne P.*, 346 Ill. App. 3d 584, 591 (2004), *aff'd*, 215 Ill. 2d 340 (2005). This ground does not focus on the parent's success but, rather, the reasonableness of her efforts and takes into account the parent's difficulties and circumstances. See *Jaron Z.*, 348 Ill. App. 3d at 259; accord *E.O.*, 311 Ill. App. 3d at 726-27 (trial court should focus on parent's efforts in light of her particular circumstances and not on whether these efforts were successful, *per se*). However, simply because a parent demonstrates some interest or affection toward her child does not render her fit under this ground; rather, her interest, concern, and/or responsibility must be reasonable. See *Jaron Z.*, 348 Ill. App. 3d at 259; *E.O.*, 311 Ill. App. 3d at 727. Moreover, "[n]oncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under [ground] (b)." *Jaron Z.*, 348 Ill. App. 3d at 259.

¶ 25    Fundamentally, great deference is afforded to the trial court's determination with respect to a finding pursuant to ground (b), and it will not be reversed unless it is against the manifest weight of the evidence. See *Jaron Z.*, 348 Ill. App. 3d at 259-60. This occurs only when the opposite conclusion is clearly evident from a review of the evidence presented. See *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19; *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010); accord *Gwynne P.*, 215 Ill. 2d at 354. In addition, we note that " ' "[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts;

consequently, factual comparisons to other cases by reviewing courts are of little value." ' "*Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19 (quoting *In re Konstantinos H.*, 387 Ill. App. 3d 192, 203 (2008), quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)); accord *Gwynne P.*, 215 Ill. 2d at 354. Ultimately, there is a "strong and compelling presumption in favor of the result reached by the trial court" in child custody cases. *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 323 (2005).

¶ 26    Based upon our thorough review of the record in the instant cause, we cannot conclude that the trial court's decision finding respondent unfit for her failure to maintain a reasonable degree of interest, concern, or responsibility for Nathan and Nicholas's welfare was against the manifest weight of the evidence. Rather, we find that the trial court's determination was wholly proper.

¶ 27    In the instant cause, the trial court made clear that, in line with the law, it was evaluating respondent's fitness with a "focus on the reasonableness of her efforts and not on their success." It then went on to praise respondent for maintaining contact with the boys, showing an interest in them, and demonstrating some of the techniques she had learned from her parenting coach. And the court was quick and definitive in noting that respondent loves her children. However, at the same time, it simply could not ignore the critical point of this cause: respondent could not manage to complete her required services. Of particular interest to the court were respondent's failure to commit to a substance-free lifestyle and to maintain a safe environment. In its view, these failures indicated that respondent could not keep the boys as a priority in her life.

¶ 28    Given the facts of this cause, we agree that this is a classic situation where the parent is subjectively interested in reunifying with her children but objectively displays unreasonable conduct in attempting to do so. With Nicholas's severe and multiple injuries to his head as an infant, the boys were screened into the system in February 2011. After some time, what followed was, initially, some marked improvement. The goal was (initially) set for return home, and respondent made "some" and even "good" progress toward that goal in the early stages of this cause, as indicated by the trial court. She was enrolled in services, testing negative for drugs, and regularly visiting her children. Based on this, she obtained supervised, and then even unsupervised, visits with them. She was well on her way to being reunited with them, as she so clearly desired.

¶ 29    But respondent did not stay on this path. Soon, her urine drops tested positive again, this time for other, and harder, drugs than marijuana, including cocaine. She began to attend her Narcotics Anonymous and Alcoholics Anonymous meetings with less frequency and was eventually terminated unsuccessfully from her outpatient drug treatment services. She was also terminated from her required individual therapy multiple times for failing to attend until, at a final point, she was terminated unsuccessfully for the last time. The same was true with respect to the parent coaching she was also to receive. She further refused to obtain the psychiatric evaluation that was required of her by her therapist and, though she reported to her case managers that she was employed, she never provided any verification of this, as requested. With respect to housing, respondent first lived with her mother—in the same home where Nicholas sustained his injuries. During this cause, she did move out and lived with a roommate, but she was forced to return to her mother's home, which was not only occupied by many others but also by her mother's paramour, whose background was not approved by DCFS. Thereafter, respondent never remedied the risks associated with her living situation, in

order to provide a safe environment for her boys or for herself. And, critically, there were times where respondent simply disappeared and lost touch with her service managers for weeks or, at one point, months at a time. This, in turn, led to irregular and sporadic visits between respondent and her children, resulting in visitation being suspended for various periods of time. And despite the initial goal of return home, once this cause progressed, never once was there a recommendation provided by any agency servicing respondent that the boys ultimately be returned to her.

¶ 30 The record before us clearly supports the trial court's characterization of this cause: respondent is, more or less, interested in Nathan and Nicholas and perhaps even concerned about them, but her conduct does not at all reasonably demonstrate that she is ready to assume the responsibility to parent them. The underlying theme, which has remained unchanged in all the notes her service providers have made for the record, is obvious: she loves them and wants to visit them, but at this point, she cannot adequately assess their needs and put them before her own in a way that merits their return to her care as their parent. It is precisely this reality that led the trial court to declare respondent unfit under ground (b).

¶ 31 Taking into account respondent's personal circumstances, her refusal to participate in and complete her services, her lack of interaction with her service providers, her continued (and elevated) drug use, and her failure to maintain regular visitation with Nathan and Nicholas more than sufficiently demonstrate that she has not maintained a reasonable degree of responsibility toward their welfare. Therefore, we find that the trial court's determination that she was unfit under section 1(D)(b) was not against the manifest weight of the evidence.

¶ 32                                    CONCLUSION

¶ 33 Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

¶ 34 Affirmed.