2024 IL App (1st) 230752-U

SECOND DIVISION
February 13, 2024

No. 1-23-0752

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| In re C.V., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
|    Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 JA 0718 |
| | ) | |
| Crystal V., | ) | |
| | ) | Honorable |
|    Respondent-Appellant). | ) | Sybil C. Thomas, |
| | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's order terminating respondent mother Crystal V.'s parental rights as to C.V. is affirmed where the trial court's finding of parental unfitness was not against the manifest weight of the evidence.

¶ 2    Respondent Crystal V. appeals the trial court's order finding her to be unfit under

sections 50/1(D)(b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2018)) and

terminating her parental rights over C.V., her minor daughter. She argues that the trial court's

finding was against the manifest weight of the evidence because: (1) she continually showed interest, concern, and responsibility for C.V. throughout the proceedings as required under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)) and section 2-29 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29 (West 2018)); and (2) she had made reasonable efforts to correct the conditions which were the basis for the removal of C.V. and reasonable progress toward the return of C.V. within the specified nine-month statutory period under section 1(D)(m) (750 ILCS 50/1(D)(m) (West 2018)) and section 2-29 (705 ILCS 405/2-29 (West 2018)).

¶ 3    Respondent is the natural mother of the minor C.V., born on June 9, 2018.[1] On August 1, 2018, the State filed a petition for the adjudication of wardship of C.V. naming both parents. The petition alleged that C.V. was neglected under the Juvenile Court Act because she was not receiving the proper and necessary support for her well-being and due to an injurious environment (705 ILCS 405/2-3(1)(a), (b) (West 2018)) and abused under the Juvenile Court Act because her parents created a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function (*id.* § 2-3(2)(ii)). The supporting facts for both allegations stated:

> "Mother has one prior indicated report for burns by neglect, cuts, bruises, welts, abrasions, oral injuries by neglect, environmental neglect and substantial risk of physical injury/environment injurious to health/welfare by neglect. Mother has

---

[1] C.V.'s natural father D.C. is not a party to this appeal. In September 2023, this court granted his counsel's motion to withdraw under *Anders v. California*, 386 U.S. 738 (1967) and affirmed the trial court's termination of his parental rights. See *In re C.V.*, No. 1-23-0759 (summary order filed pursuant Supreme Court Rule 23(c)(2), (4) (eff. Feb. 1, 2023)).

five other minors who are in DCFS custody with findings of abuse, neglect and/or

physical abuse having been entered. *** Mother has been inconsistent ***with

offered and recommended reunification services."

¶ 4     On October 18, 2019, following a hearing, the court entered an adjudication order

finding C.V. neglected due to an injurious environment and abused due to a substantial risk of

physical injury. 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2018). The order noted that respondent

"has 1 prior indicated report [and] 5 other minors in care. Mother had not completed

reunification services for this minor's siblings. Father was found guilty of aggravated battery to

this minor's sibling." On November 8, 2019, the court entered a disposition order adjudging C.V.

a ward of the court and finding respondent unable, for some reason other than financial

circumstances alone, to care for, protect, train, or discipline C.V. The permanency order entered

on November 8, 2019, had a goal of return home within 12 months and stated that respondent

had made "some" progress toward the return home of C.V. The order also noted that respondent

had been engaged in services since August 2019.

¶ 5     The permanency order entered on May 27, 2021, changed the goal to substitute care

pending court determination on termination of parental rights. The order stated that the goal was

changed because "both parents still have reunification services they have not completed."

¶ 6     The service plan from March 18, 2022, detailed why the case was opened.

> "The case was opened because the biological mother [respondent] and her
>
> paramour [D.C.] were intoxicated, belligerent, and [D.C.] had barricaded
>
> [respondent] and her three youngest children *** in his home. The police were
>
> called and they have [*sic*] to force their way into [D.C.'s] apartment where they
>
> found knives in the door and broken glass on the floor. [C.V.'s brother J.R.] was

found with the letter 'M' carved in the back of his head. [Respondent] could not identify how the carved 'M' on the back of [J.R.'s] head happened. There is a long history of domestic violence between [respondent] and [D.C.] Other family members have stated that a couple of days prior to the case opening [C.V.'s sister Ja. R.] had a black eye in which they believed was caused by [D.C.]"

¶ 7     The service plan stated that respondent visited her children and had completed the following services: domestic violence, parenting classes, substance abuse, and parenting capacity assessment. She was then participating in individual therapy and needed a psychological evaluation but failed to attend her appointment in March 2022. Respondent also failed to appear at some random drops and was not in Alcoholics Anonymous and did not have a sponsor.

¶ 8     The permanency order entered August 22, 2022, continued the goal for C.V. of substitute care pending court determination on termination of parental rights. The reasons stated for this goal were: "[C.V.] is 4 and has been in care since she was born. She is in a two parent, pre adoptive home where all of her needs are being met. Her father was convicted of aggravated battery of her sibling. Both parents have outstanding reunification services."

¶ 9     Also on August 22, 2022, the State filed its petition for the termination of parental rights for both parents and alleged they were unfit under grounds (b) and (m) of the Adoption Act. 750 ILCS 50/1(D)(b), (m) (West 2018). The petition further alleged that D.C. was unfit because he behaved in a depraved manner pursuant to ground (i) of the Adoption Act. 750 ILCS 50/1(D)(i) (West 2018). In April 2023, the State also filed a pleading specifying multiple nine-month time periods for ground (m) under the Adoption Act: October 19, 2019 to July 19, 2020; July 19, 2020 to April 19, 2021; April 19, 2021 to January 19, 2022; January 19, 2022, to October 19, 2022; and July 3, 2022 to April 3, 2022. *Id*. §1(D)(m).

4

¶ 10    On April 26, 2023, the trial court conducted the termination hearing via video conference. The following evidence was adduced at the hearing.

¶ 11    Angelica Gervacio testified that she was employed by Association House of Chicago as a case worker for open Department of Children and Family Services (DCFS) cases. She was assigned to C.V.'s case in January 2020. She was tasked with reviewing the recommended services and "link" the parents to the services as soon as possible, request reports, and provide the reports about the parents' progress to the trial court. According to Gervacio, there was an open case for C.V.'s siblings when C.V. was born. D.C. had carved "a symbol or some sort of letter or sign in the back of [C.V.'s brother's] head, carving it and leaving him with a permanent mark till this day." Respondent was convicted of "putting the children at risk, at safety risk, and environmental risk." Gervacio testified that an order of protection for respondent and all of the minor children had been entered against D.C.

¶ 12    C.V. has been in a traditional foster home. She was moved to her current placement in May 2020, and it is a preadoptive home.

¶ 13    Gervacio testified that respondent had been assessed as needing the following services:

> "substance abuse, individual therapy, family therapy, parenting classes. Upon completing the individual therapy, she would have moved onto family therapy ***. And there was a psychological evaluation there as well, and then we added – *** and she also had domestic violence, and then we added the parenting capacity assessment."

Respondent was also assessed as needing parenting coaching and for random substance drops. When Gervacio was assigned the case in January 2020, respondent had not completed any of the services.

¶ 14    Gervacio testified that in January 2020, respondent was engaged in individual therapy at Association House of Chicago, but she did not complete the service. In early 2021, respondent told Gervacio that she was going to stop individual therapy because she did not like the therapist, and she needed a new therapist. Gervacio referred respondent to Sankofa and also Pilsen Wellness Center. Respondent did not engage in therapy at Sankofa because she said no one had called her, but she began the intake process at Pilsen Wellness center and then she did not engage in the service. Gervacio did not make any additional referrals for individual therapy because the permanency goal had changed to the termination of parental rights. Gervacio told respondent that she could locate the service herself within the community and bring Gervacio the reports upon completion. Respondent never provided a report indicating the completion of individual therapy and the service remained outstanding. Respondent was never referred to family therapy because it required the completion of individual therapy. Respondent told Gervacio that she had completed a psychological evaluation, but the evaluation was then outdated. Respondent was referred for a new evaluation in November 2022.

¶ 15    Because there were still incidents of communication with D.C., Gervacio referred respondent to domestic violence services again even though respondent had completed some previously. Respondent told Gervacio that she was afraid of D.C., and he was harassing her. Respondent had completed some of the substance abuse services and Gervacio told respondent to continue with after care, including AA meetings and a sponsor. Gervacio did not have any documentation that respondent attended AA meetings or had engaged with a sponsor. Gervacio's agency considered respondent's substance abuse treatment to be unsuccessful and remained outstanding. Respondent was also referred for 14 random drops in 2020 and respondent attended 4 of those drops. The results from those four drops were negative. The agency considered a

missed drop to be a positive result. Respondent was referred to 15 drops in 2021 and 9 in 2022, but she attended 4 in 2021 and 2 in 2022. Those six drops were negative. Gervacio had referred respondent to two drops in 2023, but respondent did not attend either of those drops. The substance abuse concern for respondent was strictly for alcohol.

¶ 16    When Gervacio was assigned the case, respondent had already completed one parenting class prior to January 2020. However, Gervacio did not consider it a successful completion because she did not see proper engagement with C.V. during visitation and Gervacio had to redirect respondent several times. Gervacio then rereferred respondent to parenting classes in March 2021 and respondent completed the classes. While the parenting class recommended parent-child psychotherapy, Gervacio did not refer respondent to psychotherapy because the permanency goal had changed to the termination of parental rights. Gervacio continued to see the same lack of proper engagement during visits. Respondent was not referred to parenting coaching because of the change in the permanency goal. Gervacio referred respondent to a parenting capacity assessment in October 2021 because respondent was not demonstrating "the learned change" in her engagement with C.V. Respondent completed this assessment.

¶ 17    Gervacio supervised the weekly visits between respondent and C.V. The visits lasted one hour and were held at the agency. Gervacio testified that respondent was not participating consistently in the visitation. She estimated that respondent participated 70 to 80% of the time but missed numerous visits. Respondent was required to confirm the visitation 24 hours in advance. At the April 12, 2023 visitation, the last visit prior to the hearing, Gervacio observed that respondent was not engaged and interacting with C.V. but rather respondent was often on her phone. When the permanency goal changed to termination of parental rights, respondent's visitation was reduced to once a month. Respondent then asked Gervacio to combine C.V.'s

7

visitation time with her five siblings. Gervacio explained that respondent would no longer have one-on-one time with C.V., but respondent told her that she preferred to have "them all together."

¶ 18    The parties rested after Gervacio's testimony. Following closing arguments, the trial court found by clear and convincing evidence that respondent was unfit under grounds (b) and (m) of the Adoption Act. 750 ILCS 50/1(D)(b), (m), (n) (West 2020). The court made the following findings on the record.

> "This court finds that the mother by clear and convincing evidence is unfit pursuant to [705 ILCS 405/2-29], on the following grounds, on specifically Grounds B, and M, noting that mother has failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare and that she has failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from her care. And has failed to make that progress of return within a reasonable period of time; specifically, within nine months after the adjudication of abuse and/or neglect.

> * * *

> The court finds not only was the testimony credible to make this -- come to this determination, but also the documents that have been admitted into evidence, which outlines specifically those time frames between the time of adjudication and now as to why the -- what services were required, what services were performed and what services were completed within the nine-month period.

> In fact, between the time of April 13th of 2020 when -- this is People's Exhibit No. 8, which is the case service plan that was admitted into evidence, it

was an entire almost two years before there was a goal change in this matter. The goal did not change until the case service plan dated that is April 9 of 2022, was created that changed the goal from return home to termination of substitute care pending termination of parental rights."

¶ 19    The court then proceeded to the best interest portion of the hearing. Gervacio testified to the best interest of C.V. She stated that C.V. was in a traditional foster home and she had visited C.V. in her placement and found it to be safe and appropriate with no signs of abuse, neglect, or corporal punishment. C.V.'s medical, dental, and vision records were up to date. C.V. did not need any services and did not have any special needs. C.V.'s foster family consisted of a mother, father, and a 16-year-old female sibling.

¶ 20    At the most recent visit, Gervacio observed C.V. playing with her foster father. He was attentive and "looking at what she was saying." Her foster mother was preparing a hot meal. The foster family also has a dog and Gervacio observed C.V. interact with the dog. C.V. calls her foster mother "mommy" and her foster father "daddy." Gervacio has not seen any inappropriate or unsafe interactions. C.V. was engaged in extracurricular activities, including swimming and gymnastics. C.V. has been accepted into the family, including the extended family. She was engaged in family activities, such as vacations. The foster family wished to adopt C.V.

¶ 21    Gervacio and her agency recommended the termination of parental rights. C.V. is attached to the foster family and is loved and protected by the entire family. C.V. vocalized to Gervacio that she wanted to see her mommy, daddy, and big sister. She recognized home when they arrived there.

¶ 22    C.V.'s foster mother E.R. testified that C.V. had been with her family since May 12, 2020. They want to adopt C.V. because they love her and are ready to "grow" their family. C.V.

has a relationship with E.R.'s sisters, nieces, and mother. They have included C.V. in family vacations, including trips to Florida and Cancun. E.R. testified that if she was able to adopt C.V., she would continue sibling visitations as well as supervised visitation with respondent.

¶ 23    Following E.R.'s testimony, the parties rested in the best interest hearing. After the parties' arguments, the trial court found it was C.V.'s best interest to terminate the parental rights for both parents.

¶ 24    This appeal followed. Respondent timely filed a notice of appeal on April 26, 2023, listing the order terminating her parental rights for C.V. Accordingly, this court has jurisdiction under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 25    On appeal, respondent argues that the trial court's finding of unfitness was against the manifest weight of the evidence. Specifically, she contends that: (1) she continually showed interest, concern or responsibility in C.V. throughout the pendency of the case pursuant to ground (b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)); and (2) she made reasonable efforts or progress toward reunification from October 19, 2019 through July 19, 2020, the only time period specified in the trial court's findings, pursuant to ground (m) of the Adoption Act (*id.* § 1(D)(m)).

¶ 26    Respondent does not challenge the trial court's best interest finding at the termination hearing. Accordingly, respondent has forfeited any argument that the trial court's best interest ruling was against the manifest weight of the evidence and we will not discuss that finding any further. See *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26; see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.")

¶ 27     " 'In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act.' " *In re M.I.*, 2016 IL 120232, ¶ 19 (quoting *In re E.B.*, 231 Ill. 2d 459, 463 (2008)). "Illinois policy 'favors parents' superior right to the custody of their own children.' " *Id.* (quoting *In re E.B.*, 231 Ill. 2d at 464).

¶ 28     The termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence that the parent is "unfit" as defined by section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2020); 705 ILCS 405/2-29(2) (West 2020). "Parental unfitness must be proven by clear and convincing evidence." *In re Adoption of K.B.D.*, 2012 IL App (1st) 121558, ¶ 196. " 'A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence.' " *Id.* (quoting *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005)). Second, "[a]ssuming the parent is found unfit, the circuit court must then consider whether it is in the best interests of the children to terminate parental rights." *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49. " 'When ruling on parental unfitness, a court is not to consider the child's "best interests." ' " *In re M.I.*, 2016 IL 120232, ¶ 20 (quoting *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990)). Each case concerning parental unfitness is considered *sui generis* and is decided on its own facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). "A court may not terminate a parent's rights on grounds not charged in the petition. At the same time, however, the State is not required to prove every ground it has alleged for finding a parent unfit." *Id.* at 349. "A trial court's finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act." *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 47 (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)).

¶ 29     This court will not disturb a finding of unfitness unless it is contrary to the manifest

11

weight of the evidence and the record clearly demonstrates that the opposite result was proper. *In re Faith S.*, 2019 IL App (1st) 182290, ¶ 78. We give great deference to the trial court's finding of unfitness, defer to the trial court's factual findings and credibility assessments, and will not reweigh the evidence anew on appeal. *Id.*

¶ 30    We first review the trial court's finding that respondent was unfit pursuant to section 1(D)(b) of the Adoption Act for her failure to maintain a reasonable degree of interest, concern, or responsibility as to C.V.'s welfare. 750 ILCS 50/1(D)(b) (West 2020). Because the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a sufficient basis for unfitness. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 49. A finding of unfitness under ground (b) is based on a subjective analysis. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. This ground does not focus on the parent's success but, rather, the reasonableness of his or her efforts and takes into account the parent's difficulties and circumstances. *Id.* However, simply because a parent demonstrates some interest or affection toward his or her child does not render his or her fit under this ground; rather, his or her interest, concern, and/or responsibility must be reasonable. *Id.* " '[N]oncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under [ground] (b).' " *Id.* (quoting *Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Unlike ground (m), ground (b) has no time constraint that limits our consideration of respondent's fitness. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 50.

¶ 31    Respondent contends that she "continually showed interest, concern and responsibility in her daughter, from the time custody was taken until the time of the parental fitness hearing." Respondent focuses primarily on her visitation history to demonstrate her interest, concern, and

responsibility toward C.V. According to respondent, she "displayed appropriate behavior during visits by caring for her daughter, holding her, and bringing her food and gifts." She also noted that she completed the service requirements that "directly related to her relationship with her child," including a parenting program and a parenting capacity assessment.

¶ 32    Contrary to respondent's contentions, the record supports the trial court's finding by clear and convincing evidence that respondent was unfit to be a parent based on her failure to "maintain a reasonable degree of interest, concern or responsibility" as to her daughter's welfare. 750 ILCS 50/1(D)(b) (West 2020). As the Guardian contended in its brief, respondent did not complete the required services to progress toward reunification with C.V. The record disclosed that while respondent engaged in some of the required services, she did not successfully complete them. Nearly three years passed from when the case was first opened in August 2018, when C.V. was approximately two months old, to when the goal was changed to the termination of parental rights on May 27, 2021. Additionally, nearly two years passed from when the permanency goal changed to the date of the unfitness hearing on April 26, 2023. Respondent, thus, had more than four and a half years to complete the required services, but she failed to do so. We also point out that her older children were already in care when C.V. was born. It is well established that a failure to comply with an imposed service plan and infrequent or irregular visitation with the child may support a finding of unfitness under section (b). *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 18.

¶ 33    The service plan from April 2020 indicated that respondent was making satisfactory progress and was consistently attending supervised visitation, attending individual therapy, completed substance abuse service, her drops were negative, and she was attending AA. At that time, the permanency goal was return home.

13

¶ 34    In the October 2020 service plan, the evaluation indicated an unsatisfactory outcome. It reported that respondent had poor attendance with visits with respondent stating that she had a damaged phone or no battery to confirm the visits. The evaluation also observed that respondent had continued contact with her abuser, D.C., despite having completed the domestic violence, and noted police incident reports from June 2020 and August 2020. Respondent "dropped" individual therapy and was not able to proceed with family therapy. Respondent failed to complete the after care for substance abuse by failing to appear at random drops, not attending AA, and not having an AA sponsor.

¶ 35    The April 2021 service plan updated respondent's progress and continued with the goal of return home. The evaluation detailed that respondent was attending supervised visits with C.V. and respondent retook parenting classes, was participating in new substance abuse treatment, and her drops were negative. Respondent had not completed individual therapy, a psychological evaluation, and her after care attendance at AA meetings. The plan stated that respondent: (1) would continue to participate in the retaking of parenting classes and the following child parenting psychotherapy; (2) would participate in a psychological evaluation; (3) would restart individual therapy sessions and when appropriate proceed to family therapy; (4) would continue to participate in the retaking of substance abuse and follow the after care to attend AA meetings and have an AA sponsor; and (5) would continue to attend random drops.

¶ 36    In May 2021, the permanency goal for C.V. had changed to substitute care pending the termination of parental rights. The April 2022 service plan observed that respondent had made unsatisfactory progress. She still needed to restart individual therapy after she failed to complete the intake appointments. Respondent also had not completed her substance abuse after care by failing to attend AA meetings, obtain an AA sponsor, and failed to appear at most of the random

drops. Regarding respondent's domestic violence service, the plan noted that she completed the service, but failed to "demonstrate learned growth." Respondent was provided with a referral for a psychological evaluation, but she failed to attend the appointment. The October 2022 service plan detailed the same lack of progress with respondent's failure to restart individual therapy, attend AA meetings, obtain an AA sponsor, and attend random drops.

¶ 37 In contending that she demonstrated interest, concern, and responsibility toward C.V., as required under section (b), respondent focuses primarily on her history of complying with visitation. Gervacio testified that respondent attended 70-80% of the scheduled visits. Respondent then contends that the March 2022 parenting capacity assessment "would consider 75% engagement in services a reasonable goal or 'benchmark.' " However, the parenting capacity assessment reference to a benchmark of 75% was in relation to engaging and cooperating with all services, and specifically discussed psychotherapy and parenting coaching. Respondent did not complete either of these services. "[T]he plain meaning of the phrase '[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare' in subsection (b) includes all situations in which a parent's attempts at maintaining a reasonable degree of interest, concern, or responsibility are inadequate, regardless of whether that inadequacy seems to stem from unwillingness or an inability to comply." *In re M.I.*, 2016 IL 120232, ¶ 26. "Subsection (b) contains no state of mind requirement, nor does it carve out an exception for faultless failure." *Id.*

¶ 38 Additionally, respondent seeks to distinguish Gervacio's testimony that respondent did not display "proper engagement as far as nurturing appropriateness," by referencing a portion of the parenting capacity assessment. Respondent noted that "other personnel reported that the mother desired to hold the child, picked her up gently, maintained constant eye contact, and

spoke with her." However, the full context of that report supports Gervacio's testimony. The following answer was provided in response to this question, "What is the strength and quality of the attachment bond [respondent] has with her minor child?"

"[Respondent's] strength and quality attachment bond toward her daughter, [C.V.], has several factors to overcome. [Respondent] has expressed feeling guilty that 'C.V. was born into this, and she didn't deserve it.' Integrated Assessment reports dated 09/08/2016 and 09/20/2018 reported that [respondent's] first response to seeing [C.V.] was 'joy.' During a visit, Permanency worker, Ms. Elisa Fabian, observed [respondent] desiring to hold [C.V.] According to Ms. Fabian's report, [respondent] 'gently picked up the baby, had constant eye contact, spoke to her, and held the baby upright so she could look around.' However, according to [the foster mother], during [respondent's] visitations with [C.V.], she often observes [respondent] giving [C.V.] the phone to keep her occupied. [Respondent] may desire to build a healthy attachment toward her daughter but struggles to implement healthy parental knowledge or build a healthy attachment bond to her children, including [C.V.] [Respondent's] challenge in implementing healthy attachment bonds to her children may be impeded by symptoms of mood dysregulation/depression, which is compounded by [respondent's] history of trauma, substance use as well as her decision-making process in choosing romantic paramours. A significant barrier to [respondent's] healthy attachment is her belief that her substance use and domestic violence no longer affect her children."

¶ 39    The parenting capacity assessment also discussed how respondent's noncompliance with

services affected her ability to parent successfully.

> "[Respondent's] non-compliance with services severely affects her ability to parent successfully. This finding is predicated on [respondent's] chronic history of abuse and neglect across her development. Unstable family dynamics, sexual abuse, chronic history of substance use, school disengagement, early pregnancy at age 16, as well as the pressures of raising six children suggest interventions are necessary to reduce the risk of future child maltreatment. Moreover, [respondent] has engaged in romantic relationships with partners who have a history of gang affiliation, chronic substance use, and have a history of criminal behaviors. Without proper treatment to address the sexual abuse trauma, symptoms of depression, history of substance use, and improvement in her romantic relationship choices, any child under her care is at an increased risk for physical, emotional, and psychological abuse, leading to DCFS involvement."

¶ 40    In a summary, the parenting capacity assessment observed: "[Respondent's] parenting competency and skills are ambiguous. Meaning, that [respondent] is inconsistent in her care for her children. The symptoms of depression, history of substance use, and engagement in chaotic romantic relationships are significant factors that impede [respondent's] healthy parental approach."

¶ 41    Respondent also seeks to excuse her failure to confirm visitation and participating in parenting coaching and psychotherapy by speculating beyond what the record supports. Regarding her failure to confirm visitation 24 hours in advance, she suggests without any evidence in support that it "might be a sign of financial instability rather than a lack of reasonable interest, concern or responsibility." In discussing Gervacio's testimony that

respondent was referred for parent coaching and parent-child psychotherapy, respondent speculates that "the feasibility of the mother's participation was not expanded upon in terms of wait lists, eligibility, and the availability of" C.V. No evidence was presented that respondent was unable to comply with these referred services due to issues with a wait list or eligibility. Absent any evidence in the record to support these claims, we will disregard them as speculation.

¶ 42    Although respondent expressed some degree of care and interest in C.V., the State proved by clear and convincing evidence that she failed to maintain a reasonable degree of concern and responsibility for C.V.'s welfare. The unrebutted evidence presented at the unfitness hearing established that while respondent showed some consistency in visitation, she failed to successfully complete most of the required services to correct the reasons why C.V. was placed in care. Respondent had more than four year years from when the case was opened to comply, but she failed to do so. Based upon our thorough review of the record, we conclude that the trial court's decision finding respondent unfit under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)) was not against the manifest weight of the evidence.

¶ 43    Because we have found that the trial court's finding under ground (b) was supported by clear and convincing evidence and not against the manifest weight of the evidence, we need not reach the court's additional finding under ground (m). As previously observed, a trial court's finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 47. Since respondent has not challenged the court's best interest finding, we find that the trial court's order terminating respondent's parental right to C.V. was not against the manifest weight of the evidence.

¶ 44    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 45    Affirmed.